**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **JUAN MARTIN GARCIA,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **-VS-** | § | **NO. 4:08cv02929** |
| | § | |
| | § | ***\*\*\* DEATH PENALTY CASE \*\*\**** |
| **RICK THALER,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Institutional Division,** | § | |
| **Respondent.** | § | |

---

**FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**

---

**THIS IS A DEATH PENALTY CASE**

David R. Dow
Texas Bar No. 06064900

Frances Bourliot
Texas Bar No. 24062419

Texas Defender Service
1927 Blodgett Street
Houston, Texas 77004
Tel:  (713) 222-7788
Fax: (713) 222-0260

*Counsel for Juan Martin Garcia, Petitioner-Appellant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **JUAN MARTIN GARCIA,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **-VS-** | § | **NO. 4:08cv02929** |
| | § | |
| | § | **\*\*\* DEATH PENALTY CASE \*\*\*** |
| **RICK THALER,** | § | |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Institutional Division,** | § | |
| **Respondent.** | § | |

_____

_____

**FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS**
_____

Petitioner, Juan Martin Garcia, is currently confined on death row at the Polunsky Unit in Livingston, Texas. Through undersigned counsel and pursuant to the Constitution of the United States and 28 U.S.C. § 2254, Mr. Garcia petitions this Court to issue a Writ of Habeas Corpus and to order his release from confinement on grounds that his custody violates the Constitution and laws of the United States.

## I.      Jurisdiction.

This court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Mr. Garcia was convicted in the 185th Judicial District Court in Harris County, Texas. Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## II.      Prior Proceedings

Petitioner was convicted and sentenced to death in February 2000. The conviction and

1

sentence were affirmed by the Texas Court of Criminal Appeals on October 3, 2001. *Garcia v. State*, 57 S.W.3d 436 (Tex. Crim. App. 2000). The conviction became final on February 24, 2003, when the United States Supreme Court denied Petitioner's petition for writ of *certiorari*. *Garcia v. Texas*, 537 U.S. 1195 (2003).

Petitioner filed an application for writ of habeas corpus in the state convicting court on August 15, 2001. The convicting court recommended that relief be denied and the Texas Court of Criminal Appeals accepted the recommendation, denying relief on September 26, 2007. *Ex Parte Juan Martin Garcia*, No. WR-67,096-01 (Tex. Crim. App. 2007) (unpublished).

Petitioner filed an application for writ of habeas corpus in the United States District Court for the Southern District of Texas, Houston Division, on September 25, 2008 which raised several unexhausted claims. A Motion to Stay and Abate the proceedings was filed on October 15, 2008, and was granted on December 29, 2008. Petitioner then filed a successive application for writ of habeas corpus in the state convicting court, which was dismissed on September 16, 2009. *Ex Parte Juan Martin Garcia,* No. WR-67,096-02 (Tex. Crim. App. 2009) (unpublished). Petitioner returned to the district court, where an agreed order was signed on November 2, 2009, ordering Petitioner to file his amended petition one hundred and twenty (120) days from the date of the order.

## III.    Introduction

Petitioner was convicted and sentenced to death for shooting and killing Hugo Solano in the course of a robbery. Petitioner is mentally retarded, and his execution would therefore violate the Eighth Amendment's proscription against cruel and unusual punishment. In addition, his defense counsel was ineffective and elicited constitutionally impermissible and reprehensible testimony from his own expert witness, Dr. Quijano, who told the jury that Petitioner was more

likely to be a future danger based solely on his Hispanic race.  Further, Petitioner's sentence of death violates the Due Process clause of the Fourteenth Amendment because the jury impermissibly punished him for harms inflicted on non-parties.  Finally, his trial was marred by trial counsel's deficient performance, exhibited by the failure to investigate and discover strong mitigating evidence of abuse and torture which caused Petitioner to develop post-traumatic stress disorder.  If this evidence of post-traumatic stress disorder had been presented to the jury, it would have changed the outcome from a death sentence to a life sentence.

IV.     **Statement of Facts**

    **A.     The September 17, 1998 homicide and Petitioner's subsequent arrest**

At approximately 5:00 a.m. on September 17, 1998, Hugo Solano was getting in his vehicle to drive to work when he was robbed, shot, and killed.  R.R. Vol. 17: 150.[1]   Eleazar Mendoza, one of four individuals charged in Mr. Solano's death, testified that he and Juan Garcia approached Solano in a red Chevrolet Blazer while Raymond McBen and Gabriel Morales waited in another vehicle approximately 500 feet away.  R.R. Vol. 17: 150.  According to Mendoza, Garcia approached Solano's van, pointed a gun at him, and said in Spanish "Give me your money."  R.R. Vol. 17: 154.  When Solano replied "No", Garcia shot Solano.  R.R. Vol. 17: 155.  Mendoza said that he began driving away when he heard four more shots.  R.R. Vol. 17: 158.  While Mendoza was originally charged with capital murder in relation to the Solano murder, he accepted a reduction of his capital murder charge to aggravated assault in exchange for his testimony against Garcia. R.R. Vol. 17: 159-160.

---

[1] In this petition, the trial record will be abbreviated R.R. Vol. [number]: [page number].

Although Garcia was convicted and sentenced to death for shooting and killing Hugo Solano in the course of a robbery, he was originally stopped by police for a broken headlight and arrested for possession of a handgun.  R.R. Vol. 20: 64; R.R. Vol. 26: 6-9; R.R. Vol. 17: 108. Garcia was released from police custody regarding this incident, but a police investigation eventually linked the handgun recovered to the gun used in Solano's murder.  R.R. Vol. 17: 134–36; R.R. Vol. 18: 6.   Subsequently, Garcia was arrested pursuant to an outstanding warrant issued by the Texas Youth Commission ("TYC") and questioned about his participation in the Solano murder.  R.R. Vol. 16: 9–52.

### B.   Motion to Suppress Garcia's Written and Videotaped Statements

Garcia was tried in the 185th District Court of Harris County, Texas, Judge Susan Baetz Brown presiding.  R.R. Vol. 2:  4.  Before and during the trial, the trial court held a hearing on the defense's Motion to Suppress a written statement and a videotaped statement made by Garcia while in police custody.[2]  R.R. Vol. 15: 4–5, R.R. Vol. 1: 120.

Detective Kyle Brown of the Harris County Sheriff's office testified for the State during the Motion to Suppress hearing.[3]  R.R. Vol. 16:  7.  Det. Brown testified that on November 3, 1998, he assisted Deputy Alex Ortiz in arresting Garcia at a construction site at 3 Memorial City. R.R. Vol. 16: 7–8.  This arrest occurred pursuant to an outstanding TYC warrant.  R.R. Vol. 16: 7–8.   At the time of his arrest, Garcia was read Miranda warnings and appeared to understand them.  R.R. Vol. 16: 9–10.

While in police custody, Garcia gave two written statements and a videotaped statement

---

[2] Garcia was represented by two trial counsel, Mr. Ronald Hayes and Ms. Stephanie Martin.  They will hereinafter be referred to as "defense" or "defense counsel," whether acting singly or in concert.

[3] The State of Texas was represented by Mr. Ira Jones and Mr. Don Smyth.  They will hereinafter be referred to as the "State" whether acting singly or in concert.

4

to police regarding his involvement in the Solano murder.  R.R. Vol. 16:  12, 15.  Garcia's first written statement was taken upon his arrival at the police station.  R.R. Vol. 16: 10.  Det. Brown and Deputy Ortiz testified that the statement was given after Garcia was read his *Miranda* rights a second time.  R.R. Vol. 16: 10–11, 22.   Garcia was not promised anything in exchange for his statement and was not threatened by police in any way.  R.R. Vol. 16: 10.  Garcia also did not appear to be under the influence of alcohol or drugs.  R.R. Vol. 16: 10.  Although Garcia did not appear to have any difficulty conversing in English, detectives learned during the course of their initial interview that Garcia could not read or write English.   R.R. Vol. 15:   15–16.  Consequently, Sheriff's office employee Genie Davis read a transcript of Garcia's first written statement to him.  R.R. Vol. 16: 22.  After Ms. Davis read the first written statement to him, Garcia signed it.  R.R. Vol. 16: 22.

Garcia was then administered a polygraph examination by sheriff's office polygraph examiner Earnie Hulsey.  R.R. Vol. 16:  11.  After being informed that his polygraph answers indicated deception, Garcia told Mr. Hulsey and Det. Brown that "[he] did the shootings." When asked which shootings, Garcia responded, "All of them."   R.R. Vol. 16: 12.  Garcia then met with Deputy Ortiz and sheriff's office Det. Beall in order to make a second, corrected written statement.  R.R. Vol. 16: 12.

Prior to making his second statement, Garcia was once again advised of his *Miranda* rights.  R.R. Vol. 16: 24.  Garcia indicated that he waived the *Miranda* rights that had been read to him.  R.R. Vol. 16:  24.  This statement was witnessed by Det. Brown, Deputy Ortiz, St. Williams, and Det. Williams of the Harris County Sheriff's office.  R.R. Vol. 16:  23.  After the second statement was taken, police offered to let Garcia read the statement.  R.R. Vol. 16: 24. However, Garcia indicated that he could not read English well.   R.R. Vol. 16:   24.

5

Consequently, a civilian clerk, Linda Hemmings read Garcia's statement to him.  R.R. Vol. 15: 25; R.R. Vol. 16, 46.  She and Detectives Davis, Beall, and Lanier of the Harris County sheriff's office then witnessed Garcia sign the second statement.  R.R. Vol. 15:  26; R.R. Vol. 16:  47.  Det. Lanier testified that when Garcia signed the second statement, he did not appear to have been threatened or coerced.  R.R. Vol. 16:  41.

The following day, Det. Brown took Garcia to the Special Crimes Division of the Harris County District Attorney's Office.  R.R. Vol. 16:  13.  Once there, Garcia was interviewed by Det. Brown, Det. Beall, Deputy Ortiz, Assistant District Attorney ("ADA") Mike Anderson, ADA Donna Goode, and Harris County District Attorney investigator Gary Johnson.  R.R. Vol. 16:  14.  Before the videotaped statement was taken, Garcia was not promised anything by police or prosecutors.  R.R. Vol. 16:  15.  Nor was Garcia threatened in any way.  R.R. Vol. 16: 15.  He appeared to be in good health and did not appear to have been physically harmed in any way.  R.R. Vol. 18: 29–30, 33.  Garcia did not appear to be under the influence of drugs or alcohol. R.R. Vol. 18, 29–30.  Moreover, Garcia appeared to understand the Miranda warnings read to him.  R.R. Vol. 16: 15.  These warnings were videotaped, along with Garcia's subsequent statement.  R.R. Vol. 18: 31.  Garcia did not execute any written waivers during or after the taking of the videotaped statement.  R.R. Vol. 16: 17.

In the videotaped statement, Garcia discussed the Solano murder, as well as extraneous aggravated robberies and burglaries committed against non-parties.  R.R. Vol. 18: 131.  Subsequent to the videotaped statement, Garcia was charged with the capital murder of Hugo Solano.  R.R. Vol. 18: 26.

The State offered an unedited version of Garcia's videotaped statement into evidence, along with a redacted version of the statement which omitted all extraneous, unadjudicated

offenses.  R.R. Vol. 18: 34 – 35.  Garcia's trial counsel had no objection to the introduction of these videotaped statements for purposes of the hearing.  S.V. Vol. 18: 34–35.

After the State rested on the voluntariness of Garcia's written and videotaped statements for purposes of the Motion to Suppress, Garcia's defense counsel failed to call any witnesses in support of its own motion.  R.R. Vol. 18: 43.  Garcia's defense counsel also failed to offer any evidence in support of its own Motion to Suppress.  R.R. Vol. 18: 43.  Finally, Garcia's defense counsel failed to offer any arguments in support of its own Motion to Suppress.  R.R. Vol. 18: 44.

Ultimately, the trial court overruled Garcia's Motion to Suppress the written and videotaped statements.  R.R. Vol. 18: 49–50.  However, the trial court ordered that a statement made by either an officer or ADA that Garcia "…sure had a lot of accidents with that gun" along with Garcia's statement regarding his involvement with gangs be redacted from the videotaped statement.  R.R. Vol. 18: 49–50.

### C.    Trial Proceedings:  Guilt/Innocence Phase

During the guilt/innocence phase, the State presented testimony regarding Hugo Solano's murder, the police investigation that led to Garcia's arrest, and Garcia's confessions to the crime. R.R. Vol. 17: 11–19: 135.  Marte Ray McDowell, an off-duty Houston police officer, testified that on September 17, 1998, at approximately 5:00 am, he heard gunshots from the parking lot outside his apartment building.  R.R. Vol. 17:  11–12.  Upon hearing shots fired, he dressed, went outside, and saw a vehicle parked with the door open and a man lying on the ground nearby.  R.R. Vol. 17: 12.  Shortly thereafter, paramedics declared that the man, Hugo Solano, was dead at the scene.  R.R. Vol. 17: 14–15.  The Harris County Medical Examiner later confirmed that Solano had died as a result of four gunshot wounds to the head and neck.  R.R.

Vol. 17: 72.

Harris County Sheriff's office crime scene investigators photographed the crime scene and recovered shell casings that were eventually determined to have come from a .25 caliber gun.  R.R. Vol. 17: 18–23, 46, 48, 52.  Investigators were able to determine from gunpowder stippling found on the victim's shirt collar that Solano had been shot from a distance of one to two feet.  R.R. Vol. 17: 25–26, 38.  Fingerprints taken from Solano's car could not be matched to any known fingerprints.  R.R. Vol. 17, 38–40.

On September 28, 1998, eleven days after Solano's murder, Harris County Deputy Sheriff Denny Coker stopped a vehicle for a defective headlight.  R.R. Vol. 17: 105.  As he approached the vehicle, Dep. Coker saw the passenger exit the vehicle with something in his hands, then heard something metallic hit the vehicle's floorboard.  R.R. Vol. 17: 105.  Dep. Coker looked in the vehicle and saw a gun.  R.R. Vol. 17: 106.  Dep. Coker subsequently arrested Garcia, the passenger who had dropped the gun, for possession of a handgun.  R.R. Vol. 17: 106–08.  The gun found in the vehicle was eventually identified by a police firearms expert as a Titan .25 semi-automatic pistol.  R.R. Vol. 17: 128.

Det. Beall at the Harris County Sheriff's Office testified that during the course of his investigation into Hugo Solano's death, he ran a computer check of the offense report system and discovered that Garcia had been arrested for possession of a .25 caliber handgun—a caliber matching the cartridges found at the crime scene.  R.R. Vol. 19: 104–05.  Upon further investigation, it was determined that the cartridges found at the Solano crime scene were, in fact, fired by Garcia's Titan .25 pistol.  R.R. Vol. 17: 134–36.

Det. Brown testified that on November 3, 1998, he arrested Garcia pursuant to an outstanding warrant.  R.R. Vol. 19: 46–47.  While Garcia was in police custody, he received his

*Miranda* warnings and gave two written statements in front of police and civilian witnesses. R.R. Vol. 19:  48–50;  R.R. Vol. 19: 70–73; R.R. Vol. 19:  99–101; R.R. Vol. 19: 110–13.  A civilian clerk at the Harris County Sheriff's office read Garcia's second statement to him in its entirety, because Garcia could not read or write English.  R.R. Vol. 19:  94–97.  After reading the statement to him, the civilian clerk witnessed Garcia sign it.  R.R. Vol. 19:  96.  The next day, Garcia once again received his *Miranda* warnings and gave a videotaped statement at the Harris County District Attorney's Office in front of police and prosecutors.  R.R. Vol. 19: 53, 118–19, 124–27.  Garcia appeared to understand his *Miranda* rights and there was no indication that Garcia had been threatened or forced to give a statement.  R.R. Vol. 19: 124–27.  During the videotaped statement, Garcia discussed the Solano murder and even identified a photograph of the victim.  R.R. Vol. 19: 131–34.

The State offered a redacted version of Garcia's second written statement into evidence. R.R. Vol. 19:  80.  Other than previously made objections, Garcia's defense counsel made no objections with respect to the written statement.  R.R. Vol. 19: 80–81.  The trial court admitted the written statement into evidence and it was read aloud to the jury.  R.R. Vol. 19: 81–83.

The State offered a redacted version of Garcia's videotaped statement into evidence. R.R. Vol. 19: 127–29.  Other than previously made objections, Garcia's defense counsel made no objections with respect to the videotaped statement.  R.R. Vol. 18: 43–48.  The trial court admitted the videotaped statement into evidence and it was played in front of the jury.  R.R. Vol. 19: 129–30.

Paul Daily testified that Garcia lived with him for two months in Fall 1998.  R.R. Vol. 19: 52.  During this time, Garcia asked Daily to take a photograph of Garcia with his handgun. R.R. Vol. 19: 60–61.  Garcia also told Daily that he had robbed a man of $8.00 and shot him in

9

the face three times after the man refused to take off his wedding ring.  R.R. Vol. 19: 61–62.

The day that Garcia was arrested pursuant to his outstanding TYC warrant, Daily gave a

statement to Harris County Sheriff's officers and allowed officers to search his trailer.  R.R. Vol.

19: 22.  During the course of that search, officers found a 35mm roll of film.  R.R. Vol. 19: 107.

The 35mm film contained a photograph of Garcia with a black pistol in his waistband.  R.R. Vol.

19: 108.

Eleazar Mendoza, one of four individuals charged in Mr. Solano's death, testified that on

November 17, 1998, at approximately 5:00 am, he and Juan Garcia approached Solano in a red

Blazer while Raymond McBen and Gabriel Morales waited in another vehicle approximately 500

feet away.  R.R. Vol. 17: 150–51.  According to Mendoza, Garcia approached Solano's van,

pointed a gun at him, and said in Spanish "Give me your money."  R.R. Vol. 17: 154.  When

Solano replied "No", Garcia shot Solano.  R.R. Vol. 17: 155.  Mendoza said that he began

driving away when he heard four more shots.  R.R. Vol. 17: 157–58.  Garcia ran and caught up

with Mendoza, and the two drove away in the Blazer.  R.R. Vol. 17: 158.  While Mendoza was

originally charged with capital murder in relation to the Solano murder, he accepted a reduction

of his capital murder charge to aggravated assault in exchange for his testimony against Garcia.

R.R. Vol. 17: 159-160.

Following the presentation of this evidence, the State rested its case against Garcia.  R.R.

Vol. 19: 135.

Prior to presenting its case-in-chief, Garcia's defense counsel informed the court of its

intention to call two of Garcia's co-defendants, Raymond McBen and Gabriel Morales, to testify

on Garcia's behalf.  R.R. Vol. 20: 4–5.  However, after consulting with McBen and Morales'

attorneys, Garcia's trial counsel announced that both co-defendants had invoked their Fifth

Amendment right against self-incrimination and would not testify at Garcia's trial.  R.R. Vol. 20: 4–5.

Garcia's defense counsel declined to give an opening statement on Garcia's behalf.  R.R. Vol. 20:  7.   Moreover, Garcia's defense counsel failed to call any new witnesses.  R.R. Vol. 20: 40.   In fact, the entirety of Garcia's defense during the guilt/innocence portion of his capital murder trial took up only 17 pages of the record.  R.R. Vol. 20:  7–10; R.R. Vol. 20: 18–40.

Garcia's trial counsel first recalled Gary Johnson, an investigator at the Harris County District Attorney's office.  R.R. Vol. 20:  7.   Johnson testified that at the defense's request, he had made a copy of Garcia's videotaped statement and deleted portions of the original tape.  R.R. Vol. 20:  7–8.  Over the State's objection, defense counsel entered the edited tape into evidence and played it to the jury.  R.R. Vol. 20: 9–10.  Garcia's trial counsel then had a copy of Garcia's written statement reread to the jury.  R.R. Vol. 20:  21–22.

Finally, Eleazar Mendoza, Garcia's co-defendant, was recalled to the stand.  R.R. Vol. 20: 31.  Mendoza admitted that he had lied about some things in his original statement to police. R.R. Vol. 20: 33–35.  Mendoza also repeated that he had made a deal with the State in exchange for his testimony against Garcia.   R.R. Vol. 20: 33–35.   Specifically, instead of charging Mendoza with capital murder and seeking the death penalty, the State agreed to allow Mendoza to plead guilty to aggravated robbery for his participation in Solano's murder.  R.R. Vol. 20:  33–35.  Subsequently, the Defense rested its case and both sides closed.  R.R. Vol. 20: 49.

Outside the presence of the jury, the trial court asked if there were any objections to the jury charge.  R.R. Vol. 20:  11.  The State objected to the portion of the jury charge regarding the voluntariness of Garcia's confession, arguing that the Defense's willingness to enter a copy of the videotaped statement into evidence indicated that Garcia's statement was voluntarily given.

R.R. Vol. 20:  11.  Defense counsel responded that regardless of who entered the statement into evidence, the jury might find something in the video that would raise the issue of involuntariness.  R.R. Vol. 20:  11–12.  The trial court granted the State's request to delete the voluntariness charge from the jury charge.  R.R. Vol. 20:  50–51.

Defense counsel requested that the court change a portion of the jury charge regarding extraneous, unadjudicated offenses.  R.R. Vol. 20: 14–15.  The Defense requested that the court delete the portion of the charge that followed the phrase "that such evidence for any purposes…"  R.R. Vol. 20:  14–15.  Instead, defense counsel suggested that the phrase be added after "that such evidence for any purpose…"  R.R. Vol. 20: 14–15.  Defense counsel argued that this suggested change would indicate to the jury that extraneous, unadjudicated offenses were introduced only to complete the State's evidence and should in no way be considered as evidence of Garcia's guilt of the offense alleged against him in the indictment.  R.R. Vol. 20:  15–16.  The court denied defense counsel's request.  R.R. Vol. 20: 16.

Once the charge was read to the jury, both sides gave final arguments.  R.R. Vol. 20:  51–63.  The alternate jurors were excused and the jury was retired to consider their verdict.  R.R. Vol. 20: 64.  Following deliberations, the jury returned a finding that Garcia was guilty of capital murder.  R.R. Vol. 20: 64.

### D.      Trial Proceedings:  Punishment Phase

#### 1.      Unadjudicated, extraneous offenses committed against non-parties

After completing its opening statement, the State offered Garcia's written stipulation admitting that he was the same Juan Martin Garcia who was convicted on September 30, 1998, in Cause No. 989238 in County Court at Law No. 6 for carrying a weapon.  R.R. Vol. 21:  6.  The stipulation was entered into evidence without objection.  R.R. Vol. 21: 7.

The State then proceeded to call a number of witnesses to testify about extraneous, unadjudicated offenses allegedly committed by Garcia.  S.F Vol. 21:  7–Vol. 22:  117.  The witnesses included the following:

Paul Lenny Daily.  Daily testified that Garcia lived in his trailer for a month and a half.  R.R. Vol. 21: 9.  During this time, Garcia allegedly robbed people and brought stolen property back to Daily's trailer.  R.R. Vol. 21: 9.  On one occasion, Garcia brought home guns and asked Daily to take a picture of him with the stolen guns, including a shotgun allegedly stolen from a police officer.  R.R. Vol. 21: 10–12.  Garcia would apparently tell visitors to Daily's trailer that he (Garcia) robbed people for a living.  R.R. Vol. 21:  16.  Eventually, Daily asked Garcia to move out, because Garcia was bringing stolen property to the trailer.  R.R. Vol. 21: 14.

Jason Jett.  Jett testified that shortly after midnight on August 31, 1998, he was cleaning out his truck outside a storage facility when he was beaten and robbed of personal items and his truck.  R.R. Vol. 21: 36–41.  Jett could not identify Garcia.  R.R. Vol. 21:  44.

Matthew Henderson.  Henderson testified that at 4:10 am on August 31, 1998, he was unloading bags from the backseat of his car when he was robbed and beaten by two individuals, one of whom had a shotgun and one of whom had a knife.  R.R. Vol. 21: 60–61.  Henderson did not get a good look at either perpetrator.  R.R. Vol. 21:61.  Like Jett, Henderson could not identify Garcia.  R.R. Vol. 21:  61.

Raulot Lockett.  Over defense counsel's objections, Lockett testified that at 5:00 am on August 31, 1998, he was approached by a small, red pickup truck and subsequently robbed by a Hispanic male with a shotgun.  R.R. Vol. 21: 72–76.  Lockett did not describe his assailant and could only say that the individual was wearing a gray hooded sweatshirt.  R.R. Vol. 21:  72, 74–76.  Like Jett and Henderson, Lockett could not identify Garcia.  R.R. Vol. 21: 80.

Bruce Rose.  Rose testified that in the early morning of September 15, 1998, he was burglarized while at home.  R.R. Vol. 21:  84–87.  Items including his keys, wallet, and 1994 teal-green Toyota 4-Runner were stolen.  R.R. Vol. 21: 84–87.  Rose's vandalized car was later discovered.  R.R. Vol. 21: 88.  At no point did Rose have contact with the burglar or burglars.  R.R. Vol. 21: 84–97.  Consequently, like Jett, Henderson, and Lockett, Rose could not identify Garcia.  R.R. Vol. 21: 84–97.

David Venables.  Venables, a Houston police officer, testified that on September 15, 1998, he was approached by a white or Hispanic male, wearing a gray hooded sweatshirt and driving a Toyota 4-Runner.  R.R. Vol. 21:  101.  The individual pointed a handgun at Venables and demanded money.  R.R. Vol. 21: 101.  Venables ducked behind his vehicle, ran towards his house, and heard two gun shots fired.  R.R. Vol. 21: 102–03.  The assailant left in the Toyota 4-Runner, which appeared to have been followed by an old, battered Toyota.  R.R. Vol. 21: 104.  Venables discovered that personal property, including a Remington police shotgun, had been stolen.  R.R. Vol. 21: 105–06.  The shotgun, which was entered into evidence at Garcia's trial, was later recovered and identified as belonging to Venables.  R.R. Vol. 21: 106.

On cross-examination, Venables admitted that after the robbery, he picked a person out of a police line-up who was not Garcia.  R.R. Vol. 21: 111.  The person Venables picked out of the police line-up was not involved in the robbery.  R.R. Vol. 21: 111.  Like Jett, Henderson, Lockett, and Rose, Venables could not identify Garcia.  R.R. Vol. 21:  101–11.

Job Gomez.  Gomez testified that he was an acquaintance of Garcia's.  R.R. Vol. 21: 113.  He stated that Garcia gave him a shotgun in September 1998.  R.R. Vol. 21:  114–15.  The shotgun appeared different at trial than when Gomez first received it.  R.R. Vol. 21:  115.  Specifically, the stock and serial numbers had been removed.  R.R. Vol. 21:  115–16.  Gomez

claimed that Garcia stated he had gotten the shotgun from some cop and made alterations to the shotgun.  R.R. Vol. 115–16.  The shotgun given to Gomez was the same weapon that Venables had previously identified.  R.R. Vol. 21:  115.

James Isaac.  Isaac testified that at 3:00 am on September 17, 1998, he was at an ATM about to make a deposit when he was robbed at gunpoint by two individuals.  R.R. Vol. 21: 129–30.  They took Isaac's truck and personal property, including his wristwatch.  R.R. Vol. 21: 145.  Det. Beall of the Harris County Sheriff's office subsequently testified that Garcia was wearing a watch with the name "James C. Isaac" printed across its face when he was arrested.  R.R. Vol. 21: 146–47.  Isaac was unable to describe his assailants' race and could only say that one assailant was wearing a white hooded sweater or sweatshirt.  R.R. Vol. 21:  131.  Like Jett, Henderson, Lockett, Rose, and Venables, Isaac could not identify Garcia.  R.R. Vol. 21: 129–34.

Kevin Nunn.  Nunn testified that on September 17, 1998, he was approached by a red Blazer and robbed at gunpoint by two individuals.  R.R. Vol. 21: 150–51.  The gunman appeared to have a Hispanic accent, but was masked and therefore could not be identified.  R.R. Vol. 21:  152.  Nunn identified photographs of the Blazer that the robbers were driving.  R.R. Vol. 21:  154–55.  However, like Jett, Henderson, Lockett, Rose, Venables, and Isaac, Nunn could not identify Garcia.  R.R. Vol. 21: 150–62.

At the conclusion of Nunn's testimony, a juror told him "Good job."  R.R. Vol. 21: 162.  Nunn thanked the juror.  R.R. Vol. 21: 162.  Defense counsel did not object.  R.R. Vol. 21: 162.

Angie Allen.  Allen testified that on September 20, 1998, she was robbed at gunpoint by a man with a Hispanic accent who was wearing a gray hooded sweatshirt.  R.R. Vol. 21: 166, 170.  She was robbed of personal property such as her purse and jewelry.  R.R. Vol. 21:  168.  Like Jett, Henderson, Lockett, Rose, Venables, Isaac, and Nunn, Allen could not identify Garcia.

R.R. Vol. 21: 170.

Acasio Mesa.  Mesa testified that on September 20, 1998, he was sitting in his van when he noticed two men getting out of a small car and walking towards him.  R.R. Vol. 22: 74–75. One of the men pointed a gun at Mesa and fired four times, striking Mesa in the arm.  R.R. Vol. 22: 77–78. Like Jett, Henderson, Lockett, Rose, Venables, Isaac, Nunn, and Allen, Mesa could not identify Garcia.  R.R. Vol. 22: 78.

Benjamin Garcia.  Mr. Benjamin Garcia testified that in September 1998, his van was stolen.  R.R. Vol. 22:  53–54.  Although the van was later returned, Mr. Garcia discovered that the steering column had been broken and that there were items in the van that did not belong to him.  R.R. Vol. 22:  57.   Mr. Garcia turned these items over to the Houston Police Department. R.R. Vol. 22:  57.  Like Jett, Henderson, Lockett, Rose, Venables, Isaac, Nunn, and Allen, Mr. Garcia could not identify Garcia.  R.R. Vol. 22:  53–57.

Roy Nolin.  Nolin testified that on September 21, 1998, he was robbed at gunpoint by a man in a gray hooded sweatshirt.  R.R. Vol. 22:  60–62.  Since the robber's face was covered, Nolin could only identify the van that the robber used.  R.R. Vol. 22:  64.  The van used in the crime was later identified as being Mr. Garcia's stolen van.  R.R. Vol. 22:  64.  Like Jett, Henderson, Lockett, Rose, Venables, Isaac, Nunn, Allen, and Benjamin Garcia, Nolin could not identify Garcia.  R.R. Vol. 22:  60–64.

Ozzie Brown.  Brown testified that on September 21, 1998, he was in his vehicle when a van or truck pulled up behind him.  R.R. Vol. 22:  94–95.  A masked man with a Hispanic accent pointed a gun at Brown and demanded money.  R.R. Vol. 22:  95.  Even though Brown gave the robber $8.00 or $9.00, the robber shot Brown in the mouth when he indicated that he didn't have any jewelry.  R.R. Vol. 22:  95–96. Like Jett, Henderson, Lockett, Rose, Venables, Isaac, Nunn,

Allen, Benjamin Garcia, and Nolin, Brown could not identify Garcia.  R.R. Vol. 22: 94–97.

Patrick Meece.  Meece testified that in November 1999, he was an inmate at the Harris County Jail.  R.R. Vol. 21: 179–80.  While incarcerated, he was tied up and beaten by a group of inmates, including Garcia.  R.R. Vol. 21: 181–83.  Meece alleged that Garcia told him that it did not matter if he killed Meece since he was in jail for capital murder.  R.R. Vol. 21: 184.

Following Meece's testimony, Garcia's trial counsel requested all records in the State's possession regarding this incident.  R.R. Vol. 21: 200–01.  The State replied that it had previously shown defense counsel all relevant records to the alleged assault.  R.R. Vol. 21: 205–06.  The trial court eventually reviewed Garcia's jail disciplinary records *in camera* and found that there was no exculpatory information related to the Meece incident contained therein.  R.R. Vol. 22: 10.  Consequently, Garcia's trial counsel was not permitted to examine the records.  R.R. Vol. 22: 10.

During the Defense's case-in-chief, two witnesses were called to rebut Meece's testimony regarding Garcia's alleged involvement in this extraneous, unadjudicated offense.  R.R. Vol. 23: 68–97.

Lynnie Chatmen was incarcerated in the Harris County jail on November 27, 1999, when a fight broke out between Patrick Meece and Steven Rosenbaum.  R.R. Vol. 23: 68.  Chatmen witnessed the fight and testified that Garcia was not involved.  R.R. Vol. 23: 69–86.

Adam Acosta, a jailer with the Harris County Sheriff's office, was on duty on November 27, 1998, when a fight broke out between inmates.  R.R. Vol. 23: 93–94.  Although Meece told Acosta that he had been beaten up, Meece did not name his assailant.  R.R. Vol. 23: 95.  Subsequently, Acosta spoke with inmate Steven Rosenbaum.  R.R. Vol. 23: 95.  Rosenbaum admitted that he had assaulted Meece because he couldn't stand Meece's constant yelling.  R.R.

Vol. 23: 95–96.  Acosta noted that Rosenbaum's scuffed hands were consistent with having just been in a fight.  R.R. Vol. 23: 96.  Acosta also examined Garcia's hands, but did not see any scrapes consistent with fighting.  R.R. Vol. 23: 97.

George Cavazos.  Cavazos, a TYC employee, testified that Garcia had been committed to TYC for violating his probation for the offense of terroristic threat.  R.R. Vol. 22: 35–36.  Since Garcia failed to report to his assigned facility, TYC issued a warrant for his arrest.  R.R. Vol. 22: 35–36.  When the State offered the TYC warrant into evidence, Garcia's defense counsel did not object.  R.R. Vol. 22: 38–39.

Officers Glenn Riddle and John Ogden, and Robert Baldwin.  Officer Riddle testified that he investigated a crime scene located at 306 Sunnyside.  R.R. Vol. 21: 173–74.  As part of his investigation, Officer Riddle removed a fired cartridge casing from the crime scene.  R.R. Vol. 21: 174–75.  Officer Ogden also testified that he picked up shell casings at the crime scene.  R.R. Vol. 22: 44–46.  Robert Baldwin, a Houston Police Department criminalist and firearms examiner, testified that he examined all the shell casings found at the crime scene and determined that they had been fired from Garcia's .25 caliber semi-automatic.  R.R. Vol. 22: 50–51.

Dianne Johnson.  During its rebuttal case, the State called Deputy Dianne Johnson from the Harris County Sheriff's office to summarize various in-jail administrative offenses allegedly attributed to Garcia during his incarceration at the Harris County Jail.  R.R. Vol. 24: 104–06.

### 2.    Ana Solano

Ana Solano, the victim's widow, was the only other witness brought by the State during its punishment phase case-in-chief.  R.R. Vol. 22: 111–16.  Mrs. Solano told the jury about Mr. Solano's personal history prior to his death.  R.R. Vol. 22: 111–14.

Mrs. Solano initially informed the jury that she could not say if she would prefer that Garcia receive the death penalty.  R.R. Vol. 22: 116.  However, Mrs. Solano was recalled during the defense's punishment phase case-in-chief.  R.R. Vol. 23: 97.  Mrs. Solano testified that after a night's reflection, she had resolved to forgive Garcia.  R.R. Vol. 23: 106.

### 3.    Garcia's mitigating evidence:  Direct family members

The Defense almost entirely based its punishment-phase case on testimony from members of Garcia's immediate family.  R.R. Vol. 22: 118–Vol. 23: 46.  This testimony included the following:

<u>Esther Garcia</u>.  Mrs. Garcia testified that she is Garcia's mother and gave the jury a description of Garcia's family background and structure.  R.R. Vol. 22:  118–23.  Specifically, Garcia has an older and younger sister, and is married with two young children.  R.R. Vol. 22: 120–22.  Mrs. Garcia has been handicapped from an early age, cannot read well, has never held a job, and has survived on Social Security, Aid for Dependent Children, and food stamps.  R.R. Vol. 22:  124, 141.  She has never received any type of child support from her children's biological fathers.  R.R. Vol. 22:  125.  In fact, Garcia has never met his biological father, Raymond Olvera.  R.R. Vol. 22:  122–23.

Johnny Sierra has been Mrs. Garcia's common law husband since Garcia was one year old.  R.R. Vol. 22:  126.  Although he occasionally did odd jobs, Sierra has never held steady job.  R.R. Vol. 22:  126.  Sierra would punish Garcia by making him kneel in a corner or by hitting him with a belt.  R.R. Vol. 22:  129.  Moreover, Sierra was arrested and later imprisoned for sexually abusing Garcia's sister.  R.R. Vol. 22:  127–28.  Neither Garcia nor his mother believed that his sister, Priscilla, had been sexually abused, and Garcia blamed her for Sierra's imprisonment.  R.R. Vol. 22:  134–35.

Once Sierra went to prison, Garcia started to associate with a different social crowd and get into disciplinary/legal trouble.  R.R. Vol. 22:  132.  Garcia subsequently dropped out of school when he was fifteen.  R.R. Vol. 22:  133.  He became a member of the Fourth Ward gang when he was sixteen or seventeen years old, left his mother's house, and was eventually placed in a boy's home.  R.R. Vol. 22:  138, 140.  Mrs. Garcia stated that Garcia had learned his lesson and felt remorse for his actions.  R.R. Vol. 22: 145.

Mrs. Garcia testified that although she did not think that Garcia is mentally retarded, she could confirm that he was a slow learner who was enrolled in his school's special education classes.  R.R. Vol. 22:  130.  Mrs. Garcia was unable to provide any sort of records pertaining to Garcia's IQ score or adaptive functioning to confirm or deny her opinion.  R.R. Vol. 22:  130.  Nor did defense counsel seek records and/or witnesses to confirm or deny whether Garcia might be slow versus mentally retarded.  R.R. Vol. 22:  118–Vol. 24:  97.

Upon completion of Mrs. Garcia's direct testimony, the State indicated to the court that it wanted to bring up Garcia's TYC history on rebuttal.  R.R. Vol. 22:  146.  After giving the court a brief description of the extraneous offenses it wanted to tender, the trial court asked the State for a list, since she had no idea of the extent of Garcia's juvenile history.  R.R. Vol. 22:  148.  To this, defense counsel commented, "Neither did I."  R.R. Vol. 22:  148.

Over defense counsel's objection, the court ruled that the State could question Mrs. Garcia about Garcia's juvenile history.  R.R. Vol. 22:  151–53.  On cross-examination, the State proceeded to question Mrs. Garcia about eight extraneous instances of juvenile delinquency.  R.R. Vol. 22:  154–63.

<u>Johnny Sierra</u>.  Sierra testified that from the time he moved into the Garcia household, he had a generally good relationship with Garcia, but would occasionally discipline the children by

making them sit on their knees in the corner or by spanking them with a belt.  R.R. Vol. 22: 169–70.  Sierra claimed he did not have a drug or alcohol problem from the time that he began living with the Garcias until the time he went to prison for molesting Garcia's sister.  R.R. Vol. 22:  166–68.  Sierra denied ever sexually abusing Garcia.  R.R. Vol. 22:  177.  Sierra had been incarcerated four times before his 1992 conviction of Indecency with a Child.  R.R. Vol. 22: 168.  In total, Sierra had spent twenty to twenty-five years in prison.  R.R. Vol. 22: 177.

Priscilla Garcia.  Priscilla, Garcia's older sister, testified that when she was growing up, Sierra did not foster a relationship with her or her siblings.  R.R. Vol. 22: 187–88.  Rather, Sierra was physically abusive.  R.R. Vol. 22: 189–90.   He would drink excessively and take drugs such as marijuana and heroin.  R.R. Vol. 22: 190–91.

When Garcia was a small child, Sierra would fondle and play with Garcia's penis.  R.R. Vol. 22: 192–93.  Mrs. Garcia knew that Sierra was fondling Garcia's sexual organ.  R.R. Vol. 22: 196.

When she was nine, Priscilla was taken into custody by Child Protective Services.  R.R. Vol. 22: 193–95.  She ran away from the girls' home where she was placed and returned home, where Sierra began molesting her.  R.R. Vol. 22: 193–95.  Once Priscilla made an outcry and Sierra was sent to prison, the remainder of her family turned against her.  R.R. Vol. 22: 193–95.

Alexandra Garcia.  Alexandra, Garcia's younger sister, testified that Sierra was a good father-figure and that Garcia was a regular child.  R.R. Vol. 23: 14–16.  Garcia's disciplinary problems began after Sierra went to prison.  R.R. Vol. 23: 17–19.   Although Garcia was associated with the Fourth Ward for Life gang, it was unknown whether he was a member.  R.R. Vol. 23:  21.  Garcia used drugs, specifically marijuana, while he was growing up and began drinking when he was sixteen.  Alexandra had visited Garcia in prison and confirmed that he is

remorseful for his actions.  R.R. Vol. 23: 25–26.

Heidi Garcia.  Heidi testified that she was married to Garcia and had two young children with him.  R.R. Vol. 23: 41.  Garcia was working construction when they met and continued to do so after their marriage.  R.R. Vol. 23: 41.  For the most part, Garcia was able to support his family and his children were the center of his life.  R.R. Vol. 23: 44.

### 4.    Garcia's mitigating evidence:  Walter Quijano

Defense counsel called Dr. Walter Quijano, a clinical psychologist in private practice, to testify about factors that contribute to future dangerousness.  R.R. Vol. 23: 108–09.  Quijano testified that there are three sets of factors that contribute to future dangerousness:  statistical factors, environmental factors, and clinical factors.  R.R. Vol. 23: 111.

Quijano stated that contributing factors to future dangerousness include things such as drugs, sex, and a person's socioeconomic situation.  R.R. Vol. 23: 112–13.  Many of these factors are controlled and eliminated in prison settings, specifically in the Texas Department of Corrections.  R.R. Vol. 23: 113–20.  Over the State's objections, Quijano played a video to the jury of a visit made to a Texas Department of Corrections ("TDC") unit on March 4, 1999.  R.R. Vol. 23: 122–49.  The video illustrated some of the safety measures employed by TDC in the prison's higher level security areas.  R.R. Vol. 23: 120.

Quijano also testified that race plays a role in future dangerousness.  R.R. Vol. 23:112.  Specifically, among dangerous people, minorities are over-represented in the population of the so-called dangerous population.  R.R. Vol. 23: 112.  Blacks and Hispanics are therefore overly-represented in the population of individuals who might pose a future danger to society.  R.R. Vol. 23: 112.

The Defense rested its case-in-chief without presenting any witnesses who could testify

about Garcia's cognitive abilities or adaptive skills.  R.R. Vol. 22: 118–Vol. 24: 97.  Neither did

defense counsel call any experts who might be able to determine whether Garcia might be

mentally retarded or whether he suffered from psychological damage due to his childhood

stressors.  R.R. Vol. 22: 118–Vol. 24: 97.

Immediately after the jury returned their sentence of death, the trial judge entered the jury

room and met with the jurors for about fifteen minutes.  Exhibit A (Declaration of Thomas

Bankard) at 2.  The judge told the jury that they had done the right thing in sentencing Petitioner

to death; there were things the jury could not know about during the trial, but that they had "done

the right thing."  Exhibit A (Declaration of Thomas Bankard) at 2.

### Claims for Relief

## I.  Petitioner's death sentence violates the Eighth and Fourteenth Amendments because he is a mentally retarded person.

### A.  The mental retardation standard

The execution of a mentally retarded person violates the Eighth Amendment's

proscription against cruel and unusual punishment.  *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

Because the Texas Legislature has not yet provided a statutory definition of mental

retardation, it is appropriate for this Court to rely on the definitions set out by the American

Association of Mental Retardation ("AAMR") and the American Psychiatric Association

("APA") to assess whether a prima facie case has been made.[4]  *Ex parte Briseno*, 135 S.W.3d 1,

5–8, 14 (Tex. Crim. App. 2004).  Both organizations recognize that mental retardation is a

disability characterized by:

---

[4]       The AAMR is now called the American Association on Intellectual and Developmental Disabilities ("AAIDD").  Petitioner will use AAMR to refer to the manual published under that name, but will use AAIDD to refer to the organization itself and publications published under the new name.

(1) "significantly subaverage" (APA) or "significant limitations" in (AAMR) intellectual functioning,

(2) accompanied by "significant limitations" in adaptive behavior,

(3) the onset of which occurs prior to the age of 18.

*See* American Association of Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed. 2002) [hereinafter 2002 AAMR Manual]; American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41 (Text Revision, 4th ed. 2000) [hereinafter DSM-IV-TR]; *Briseno*, 135 S.W.3d at 7.

Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below, or approximately two standard deviations below the mean. *Briseno*, 135 S.W.3d at 7 n.24 (citing DSM-IV at 39). The operational definition of mental retardation, however, is in effect expanded to 75 when taking into account the standard error of measurement in assessing IQ scores, which is approximately five points. 2002 AAMR Manual at 58-59; DSM-IV-TR at 41–42; *see also Atkins*, 536 U.S. at 309 n.5 (a score of 75 is typically considered the cutoff IQ score for the intellectual functioning prong of the mental retardation definition); *Ex parte Modden*, 147 S.W.3d 293, 298 (Tex. Crim. App. 2004) (a 70–75 IQ score "generally indicates subaverage general intellectual functioning"). Additionally, the American Association on Intellectual and Developmental Disabilities User's Guide to the 2002 AAMR Manual recommends that clinicians take the Flynn Effect, discussed *infra*, into account when interpreting IQ scores and assessing intellectual functioning. American Association on Intellectual and Developmental Disabilities, User's Guide: Mental Retardation, Definition, Classification, and Systems of Supports 20–21(10th ed 2007) [hereinafter AAIDD User's Guide].

The AAMR Manual also requires that there be "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical skills." 2002 AAMR Manual at 1.

24

"Significant" can be established by the limitations in one of the three domains.  AAMR 2002 at

74, 77–78.  The AAMR Manual provides examples of "representative skills" in each of the three

domains:

(1)     Representative **conceptual skills** are "language, reading and writing, money concepts, and self-direction."  *Id*. at 82.

(2)     Representative **social skills** are "interpersonal, responsibility, self-esteem, gullibility, naiveté, follows rules, obeys laws, avoids victimization."  *Id*.

(3)     Representative **practical skills** are "activities of daily living, instrumental activities of daily living, occupational skills, and maintains safe environments." *Id*.

The APA definition requires that there be "significant limitations" in at least two of the

following eleven domains:

(1)     communication
(2)     self-care
(3)     home living
(4)     social/interpersonal skills
(5)     use of community resources
(6)     self-direction
(7)     health
(8)     safety
(9)     functional academics
(10)    leisure
(11)    work

DSM-IV-TR, at 41.

The 2002 AAMR Manual describes four categories of risk factors that may interact to

cause mental retardation.  The four categories of risk factors are:

(1) biomedical: factors that relate to biologic processes, such as genetic disorders or nutrition;

(2) social: factors that relate to social and family interaction, such as stimulation and adult responsiveness;

(3) behavioral: factors that relate to potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse; and

25

(4) educational: factors that relate to the availability of educational supports that promote mental development and the development of adaptive skills.

2002 AAMR Manual at 126.  The 2002 AAMR Manual emphasizes that "the impairment of functioning that is present when an individual meets the criteria for a diagnosis of mental retardation usually reflects the presence of several risk factors that interact over time." *Id.*

## B.    Petitioner is mentally retarded

Petitioner is mentally retarded.  The evidence shows that: (1) his IQ, as reflected in the results of IQ tests administered to him is significantly subaverage; (2) he has significant limitations in his adaptive functioning; and (3) he exhibited these diagnostic features before the age of eighteen.

### 1.    Evidence of Impairments in Intellectual Functioning

### a.    WISC-IV (2009)

Petitioner was examined by Dr. Martinez on October 15, 2009 and given the Wechsler Adult Intelligence Scales IV (WAIS-IV).  The WAIS-IV is the most recent, and therefore most reliable, version of the respected Wechsler Adult Intelligent Scales.[5]  Petitioner's full-scale IQ score is a 75, which "represents significantly sub-average intellectual functioning."  Exhibit B (Report of Intellectual Assessment by Dr. Martinez).  This score puts him within the range designated by the 2002 AAMR Manual at which a diagnosis of mental retardation may be made. 2002 AAMR Manual at 58-59; DSM-IV-TR at 41–42; *see also Atkins*, 536 U.S. at 309 n.5 (a

---

[5] The Wechsler scales are comprehensive, cover both verbal and non-verbal domains, and are the "standard instrument in the U.S. for assessing intellectual functioning." *Moore v. Quarterman*, 491 F.3d 213, 232 n.7 (5th Cir. 2007) (Dennis, J., dissenting). *See also Howell v. State*, 151 S.W.3d 450, 469 (Tenn. 2004) (Drowota III, J., concurring and dissenting) (referring to Wechsler scales as "gold standard").

score of 75 is typically considered the cutoff IQ score for the intellectual functioning prong of the mental retardation definition); *Ex parte Modden*, 147 S.W.3d 293, 298 (Tex. Crim. App. 2004) (a 70–75 IQ score "generally indicates subaverage general intellectual functioning"). Because it was obtained using a reliable and respected test and was administered closest of any other known IQ tests to the date of its norming, this score is the most accurate known measurement of Petitioner's intellectual functioning.

**b.**      **TONI-2 (1993 and 1996); TONI-3 (2000)**

Counsel is aware of two TONI-2 assessments, reporting a score of 100 at the age of thirteen on July 22, 1993 and a score of 91 at the age of fifteen on January 13, 1996; and the TONI-3 assessment reporting a score of 83 at the age of twenty on June 21, 2000, but urges that they should not be relied upon in determining Petitioner's intellectual functioning.  These exams were administered as part of a TYC and TDCJ evaluation, and the setting and scoring of the exams are unclear.

The TONI is a one dimensional test consisting of fifty-five questions, all of which require the person being tested to identify relationships between abstract figures. S. Bostantjopoulou et al., *Concurrent Validity of the Test of Nonverbal Intelligence in Parkinson's Disease Patients*, J. Psychol., Mar. 2001, at 205, 207.  In contrast, the Weschler exam is multi-dimensional, having respondents construct designs with blocks, identify pictures that best go together, and selecting stimulus to complete a target matrix. Laura S. DeThorne & Barbara A. Schaefer, *A Guide to Child Nonverbal IQ Measures*, Am. J. Speech-Language Pathology, Nov. 2004, at 275, 279. "High-stakes assessments that will result in diagnoses . . . should use multidimensional batteries....  In contrast, if one is conducting a low stakes assessment . . . a one-dimensional battery may suffice, such as the TONI-3 [successor of the TONI-2] . . . ." *Id.* at 286.

27

Moreover, the TONI is not as reliable a test as the Weschler measures.  One measure of an intelligence test's reliability is its internal reliability, or the degree to which test scores are consistent across items. *Id*. at 284. In a 2004 study, the TONI-3 was found to not meet the established criterion for internal reliability while the Weschler exams did meet the criterion. *Id*. at 282. Another measure of an intelligence test's reliability is the degree to which test scores are consistent across time. *Id*. at 283. The scores assigned to Petitioner's TONIs, instead of being consistent, varied by seventeen points from one another.

Finally, not enough is known about the reliability of the administration and scoring of these tests to rely on them.  They are merely mentioned in clinician's notes, and it is unclear under what conditions the exams were given or how they were scored.

### c.    WISC-III (1995)

Counsel is also aware that on January 25, 1995 at the age of fourteen, Petitioner was administered a WISC-III and received a reported full scale IQ score of eighty-three.  Application of the Flynn Effect to this score results in an adjusted IQ score of 81[6].  Currently, very little is known about the administration of this instrument, including the circumstances surrounding its administration and whether proper protocol was followed in its administration and scoring.  The administrator, Ken Murray, was not a licensed psychologist at the time the test was given, raising further questions about the test's administration and the score's reliability.

### 2.    Academic performance

Petitioner's school records demonstrate that he was several grade levels behind in virtually all of his classes, that he repeated the third grade, and that he was placed in special

---

[6] Flynn's empirical research has demonstrated that the average obtained by any given group on the Wechsler scales has historically increased by approximately 0.33 points per year. AAIDD USER'S GUIDE at 20-21; *Moore*, 491 F.3d at 232 n.7 (Dennis, J., dissenting).

education classes.  The first time he was enrolled in the third grade, his scores indicate that he is still functioning at the first grade level in math, reading, language, and spelling.  Exhibit C (TYC records) at 152.  When he repeats the third grade, he is placed in special education classes.  *Id.* In the fifth grade, he is still working at a third grade level in math and a second grade level in reading, writing, and spelling; however, since Petitioner repeated the third grade, he is effectively three and four age equivalent years behind his peers in these subjects.  Exhibit C (TYC records) at 153.   His middle school records indicate that he remains in special education classes for all of his core subjects.  Exhibit C (TYC records) at 154-158.

### 3.   Evidence of Significant Limitations in Adaptive Behavior

Petitioner also meets the second prong of the definition of mental retardation: he possesses significant limitations in adaptive behavior.  Petitioner possesses significant limitations in his conceptual, social, and practical skills, the onset of which occurred prior to his eighteenth birthday.

### a.   Conceptual skills

Representative conceptual skills are language, reading and writing, math skills, and self-direction.  (AAMR 2002 at 82).  At an early age, Petitioner displayed significant limitations in his language skills.   Angela Costigan, Petitioner's special education teacher at Wharton elementary who was in charge of deciding the plan for his educational growth and with whom Petitioner spent 60% of the school day, recalled that he did not have conversational skills.  Exhibit D (Affidavit of Angela Costigan) at 1, 7.  Petitioner could not communicate because he didn't have a vocabulary; he didn't possess the words to communicate and express himself.  Exhibit D (Affidavit of Angela Costigan) at 7.  Petitioner was placed in special education not only because his academics were behind his peers, but also because he was "unable to socialize

on the same level as the other children."  Exhibit D (Affidavit of Angela Costigan) at 2.

Petitioner's cousin, Patricia McBen also took note of his lack of language skills.  She remembers

that he had trouble explaining things in words, could not explain how to do anything, and did not

understand things that others tried to explain to him.  Exhibit E (Affidavit of Becki Lyn

Skidmore) at 9.  Petitioner's younger sister, Alexandra Garcia, also noted his limitations with

language skills – she notes that he was so easily distracted that he would stop talking to people in

the middle of a conversation.  Exhibit F (Affidavit of Alexandra Garcia) at 10.

Ms. Costigan states that his reading was at a first or second grade level.  Exhibit D

(Affidavit of Angela Costigan) at 7.  According to both of Petitioner's sisters, he was not able to

read or write.  Exhibit F (Affidavit of Alexandra Garcia) at 14; Exhibit G (Declaration of

Priscilla Zamora) at 6.  Alexandra Garcia remembers that he didn't learn how to read or write

until he was seventeen or eighteen years old.  Exhibit F (Affidavit of Alexandra Garcia) at 20.

Petitioner's ex-girlfriend tried to help him learn how to read and write, and they would work on

these skills for several hours every day; however, he still was unable to read simple things.

Exhibit F (Affidavit of Alexandra Garcia) at 20; Exhibit H (Affidavit of Gloria Alejandro) at 6.

Petitioner's special education teacher Angela Costigan, recalls that he did not understand

the difference between addition and subtraction.  Exhibit D (Affidavit of Angela Costigan) at 7.

She tried to teach him how to do these things, but he never could understand them.  Exhibit D

(Affidavit of Angela Costigan) at 7.  His older sister, Priscilla Zamora, recalled that when

Petitioner could not complete a math problem he would get frustrated and give up.  Exhibit G

(Declaration of Priscilla Zamora) at 6.

Petitioner was always a follower and could never lead other people.  Exhibit D (Affidavit

of Angela Costigan) at 4.  "He was not really even capable of making a decision for himself."

30

Exhibit D (Affidavit of Angela Costigan) at 4.  He never initiated projects but would only do what he was assigned to do.  Exhibit D (Affidavit of Angela Costigan) at 10, 12.  When things did not go as planned, he did not respond well.  Ms. Costigan remembers that "he couldn't tolerate failure" and would not complete tasks that he found difficult.  Exhibit D (Affidavit of Angela Costigan) at 13.  He would respond with anger and being destructive when he would not understand things.  Exhibit D (Affidavit of Angela Costigan) at 13.

### b.      Social skills

Petitioner also showed significant limitations in social skills beginning at a young age.  Representative **social skills** are "interpersonal, responsibility, self-esteem, gullibility, naiveté, follows rules, obeys laws, avoids victimization."  AAMR 2002 at 82.

Both Ms. Costigan and Alexandra recall that Petitioner was never able to make friends.  Exhibit D (Affidavit of Angela Costigan) at 3; Exhibit F (Affidavit of Alexandra Garcia) at 16.  Petitioner was not able to socialize on the same level as other children.  Exhibit D (Affidavit of Angela Costigan) at 2.  According to Alexandra, the other students at school, *including the ones in his special education class*, would make fun of him and call him slow.  Exhibit F (Affidavit of Alexandra Garcia) at 15.

As a student, Petitioner never initiated projects or got involved in his work.  Exhibit D (Affidavit of Angela Costigan) at 10.  If he started a task and found it to be too difficult, he would not complete it.  Exhibit D (Affidavit of Angela Costigan) at 13.  According to his cousin, Mr. Garcia had trouble understanding the consequences of his actions – if he wanted something, he would just do it and not consider the consequences.  Exhibit E (Affidavit of Becki Lyn Skidmore) at 10.

Petitioner also lacked any self-esteem as a child.  Ms. Costigan would sometimes ask her

students what they wanted to be when they were older and Petitioner could not come up with an answer, saying things such as "there isn't anything for me to be."  Exhibit D (Affidavit of Angela Costigan) at 15.  He would always try to hide the fact that he didn't know how to do simple things and would try to avoid looking stupid.  Exhibit E (Affidavit of Becki Lyn Skidmore) at 8.

According to Alexandra, people could get Petitioner to do whatever they wanted—even if he thought that it would lead to him getting in trouble or getting hurt.  Exhibit F (Affidavit of Alexandra Garcia) at 13.  She recalled a story when he went to the store with his friends who, upon arriving at the store, told Petitioner to get the money from the register while they stood as lookouts.  He went along with their plan "just because the guys told him to."  Exhibit F (Affidavit of Alexandra Garcia) at 13.  His cousin, Patricia McBen, also remembered Juan being extremely gullible as a child.  Exhibit E (Affidavit of Becki Lyn Skidmore) at 7.  She stated that "if you told Juan 'if you do this, I'll give you some candy,' he would do it."  Exhibit E (Affidavit of Becki Lyn Skidmore) Patricia at 7.

Petitioner would often get in trouble for doing the wrong things which would result in him getting beaten by his stepfather, but, according to his cousin, he didn't know "what were the right things to do."  Exhibit E (Affidavit of Becki Lyn Skidmore) at 6.  Similarly, it is regularly noted that he fails to attend his required day treatment program.  Exhibit C (TYC records) at 31, 96, 108, 141, and 143.  Petitioner, again, does not understand what he is required to do, so he escapes and tries to ignore the problem.  In school, he didn't follow rules or directions well – this was not intentional but, instead, the result of him not understanding what it was he was to do.  Exhibit F (Affidavit of Alexandra Garcia) at 14.

### c.      Practical skills

There is also evidence that Petitioner has significant limitations that were manifested

prior to his eighteenth birthday in practical skills, the third area of skills defined by the AAMR

Manual.   Practical skills include those skills one performs during his everyday life.   He was

unable to follow simple directions for cooking.   For example, his cousin recalls that when she

told him to put "about half a cup of water" into food that she was cooking, he could not

understand how to do that and just gave up.   Exhibit E (Affidavit of Becki Lyn Skidmore) at 9.

He was unable to follow the directions to bake a cake or cook anything – his sister would have to

read them to him and make sure he followed them correctly.   Exhibit F (Affidavit of Alexandra

Garcia) at 20.   Petitioner also demonstrated a very poor concept of time.   As his cousin

remembers, he would remember doing things a long time ago that, in fact, he had done just the

day before.   Exhibit E (Affidavit of Becki Lyn Skidmore) at 11.

### 4.  Onset Prior to the Age of 18.

The adaptive deficits described by Petitioner's sisters, teacher, and cousin, as well as the

limitations demonstrated by his school records, occurred prior to the age of 18.

## II.  Unadjudicated Extraneous Offenses

### A.  Mr. Garcia's death sentence violates the Due Process Clause of the Fourteenth Amendment, because it constitutes State punishment for extraneous, unadjudicated offenses against non-parties.

#### 1.  In death penalty cases, the Due Process Clause requires individualized review of extraneous, unadjudicated offenses.

The Fourteenth Amendment guarantees that States may not "deprive any person, of life,

liberty or property, without due process of law…."   U.S. Const. Amend. XIV.   In furtherance of

the Due Process Clause, the Supreme Court has provided broad guidance that places substantive

limits on the types of evidence that the State may introduce at the punishment phase.   *See*, *e.g.*,

*Woodson v. North Carolina*, 428 U.S. 280 (1976) (overturning the North Carolina death penalty

statute because it failed to permit juries to consider the character of individual defendants).   In

*Woodson v. North Carolina*, the Court emphasized that because "the penalty of death is qualitatively different from a sentence of imprisonment, …there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 305. A necessary precondition of a reliable sentence is a proceeding where the capital defendant receives an "individualiz[ed] sentencing determination." *Id.* at 304. Such individualized consideration requires, at a minimum, that the jury consider "the character and record of the individual offender and the circumstances of the particular offense." *Id.*

The Texas Code of Criminal Procedure permits the State to present "evidence of extraneous conduct" during the punishment phase of capital murder cases in which the State is seeking the death penalty. Tex. Code Crim. Proc. Art. 13.071, sec. 2(a)(1). "Evidence of extraneous conduct" commonly involves extraneous, unadjudicated offenses. *See id*. These extraneous, unadjudicated offenses need not have resulted in prior criminal charges, much less criminal convictions. *See id*. The only restriction on evidence of extraneous, unadjudicated offenses that the State may present is a notice requirement. *See id*. at sec. 2(a)(1). Once presented, unadjudicated, extraneous offenses are used to guide the jury in determining "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Id*. at sec. 2(b)(1). Accordingly, jurors in a capital case may consider evidence of unadjudicated offenses solely with respect to determining an offender's character, but may not punish or enhance the punishment of a defendant based on these extraneous, unadjudicated offenses. *See id*. at sec. 2(d)(1).

The Supreme Court has denied a number of petitions for certiorari regarding the constitutionality of introducing evidence of extraneous, unadjudicated offenses during the sentencing phase of a defendant's capital trial. *E.g., Sharp v. Texas*, 488 U.S. 872 (1988)

(denying certiorari on the issue of whether the presentation of extraneous, unadjudicated offenses during the sentencing phase of a defendant's capital trial is constitutional).  However, in response to the Court's refusal to directly address this issue, a number of Supreme Court justices have written dissenting opinions with respect to the denial of certiorari.  *See, e.g., id.* (Marshall, J., dissenting).  With respect to this issue, Justice Marshall, for example, observed that:

> [he] would grant the petition [of certiorari] to resolve the question whether the Eighth and Fourteenth Amendments preclude the introduction of evidence of unadjudicated criminal conduct at the sentencing phase of a capital case.  As [Justice Marshall had] recently argued in *Williams v. Lynaugh*, 484 U.S. 935 (1987) and *Devier v. Kemp*, 484 U.S. 948 (1987) the admission of such evidence cannot be reconciled with the heightened need for reliability in capital cases.

*Id.*

### 2. The Due Process Clause forbids the State from punishing Mr. Garcia for injury inflicted on a non-party.

#### i. *Philip Morris USA v. Williams* affirmatively establishes that under the Due Process Clause, a State cannot punish a defendant for injury inflicted on a non-party

In *Philip Morris USA v. Williams,* the United States Supreme Court reviewed the constitutionality of a punitive damage award that was based, in part, on injuries inflicted to individuals who were not parties to the proceeding.  *Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1063 (2007).  The Court held that a punitive damages award violates the Due Process Clause, and is therefore unconstitutional, when it is based in any part on harm that the defendant has caused to third parties.  *Id.*

*Philip Morris* arose from the death of Jesse Williams, whose widow brought suit against Philip Morris for negligence and deceit.  *Id.*  The jury ultimately awarded Williams compensatory damages of approximately $821,000 and punitive damages of $79.5 million.[7]  *Id.*

---

[7] The trial judge found the punitive damage award "excessive" and reduced the award to $32 million.  *Williams*, 127 S. Ct. at 1061.  After both parties appealed, the Oregon Court of Appeals

During the trial, Williams' counsel introduced evidence of other individuals who had been harmed by cigarettes manufactured or marketed by Philip Morris.  *Id.*

In striking down the punitive damages award, the Court held that "the Constitution's Due Process Clause forbids a state to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties."  *Id.* at 1063.  The Court emphasized that under the Due Process Clause, a state cannot punish an individual "without first providing that individual with 'an opportunity to present every available defense.'"  *Id.* (quoting *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)).  A defendant faced with punishment for injuring a "nonparty victim," however, "has no opportunity to defend against this charge."  *Id.*  The end result is a "standardless" system that leaves the jury to "speculate" and amplifies the "fundamental due process concerns" of "risks of arbitrariness, uncertainty and lack of notice."  *Id.*

Third-party injury is relevant to the "reprehensibility" of the defendant's conduct.  *Id.* at 1064.  *Philip Morris* thus recognizes a distinction of constitutional magnitude between, on the one hand, taking third-party injury into account for purposes of assessing reprehensibility and, on the other hand, punishing the defendant directly for the infliction of that third-party harm.  *Id.*  To be sure, the Court acknowledged that there may be a "practical problem" of distinguishing between "taking account of harm caused others" and "punish[ment] [of] the defendant for having caused injury to others."  Nonetheless, the Due Process Clause requires that a state endeavor to ensure that juries do not punish defendants for harm inflicted on non-parties.  *Id.* at 1065.

---

restored the original punitive damages award.  *Id.*  Philip Morris then sought review, which was denied by the Oregon Supreme Court.  *Id.*  The United States Supreme Court subsequently remanded the case in light of *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 403 (2003).  *Id.*  The Oregon Court of Appeals did not change its original decision, which prompted Philip Morris to seek review again.  *Id.*  The Oregon Supreme Court granted review and held that the $79.5 million award was not "grossly excessive."  *Id.* at 1062.  The United States Supreme Court subsequently granted certiorari.  *Id.*

Courts using the *Philip Morris* analysis tackle this "practical problem" by looking to counsel's closing argument to the jury for evidence of an "unreasonable and unnecessary risk" of an unconstitutional punishment.   *Philip Morris,* 127 S. Ct. at 1065.  Persuasive         authority indicates that some courts view closing statements filled with "veritable supernova[s] of prejudice," in a particularly suspicious light. *Moody v. Ford Motor Co., 506* F. Supp. 2d 823, 849 (N.D. Okla. 2007).  At contention in *Moody* were damages relating to a roll-over traffic fatality in a Ford Explorer. *Id.* at 825. The court found a close parallel between the closing statement in *Philip Morris*, pointing to the millions of smokers facing pending harm from tobacco companies, and the *Moody* plaintiff's statement calling attention to the thousands of roll-over deaths from all vehicles each year. *Id* at 849. While the court noted a permissible use of such evidence to determine reprehensibility, they held that "the jury must be instructed that this evidence has no bearing on the amount of damages." *Id.* at 850.  Other courts have addressed the problems with prejudiced filled closing statements, insisting that "reference[s] to past harm to third parties" is a part of such prejudicial statements, and granting relief when these statements are presented without any caution or limiting statements. *Snyder v. Phelps,* 533 F. Supp. 2d 567, 592 (D. Md. 2008).

> ii.  **Because *Philip Morris'* constraints on punitive damages is closely analogous to the future dangerousness inquiry, Due Process applies to the punishment phase of a capital proceeding and forbids a state from punishing a defendant for harm done to a non-party.**

Numerous Supreme Court cases have "described [punitive damages] as 'quasi-criminal,' operat[ing] as 'private fines' intended to punish the defendant and to deter future wrongdoing." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001).   "Future wrongdoing" in a civil context is essentially identical to the "future dangerousness" finding in a capital murder trial.  Both speculate about what the defendant might do in the future based upon

his past acts.  *Compare id*, *with* Tex. Code Crim. Proc. Art 37.071 sec 2(b)(1).

Further, the jury's "imposition of punitive damages [in a civil case] is an expression of its moral condemnation."  *Cooper Indus*., 532 U.S. at 432.  In *State Farm Mut. Automobile Ins. Co. v. Campbell*, the Court described punitive damages as "aimed at deterrence and retribution."  *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).  Likewise, "the death penalty is said to serve two principal social purposes: retribution and deterrence."  *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

The Court's language in *Philip Morris USA v. Williams*, coupled with the similarity between criminal punishments and punitive damages, dictate that the Court's Due Process analysis applies with equal force to capital proceedings.[8]  That decision compels the conclusion that while a jury may take unadjudicated offenses into account in assessing the defendant's character, it may not punish the defendant because of those same offenses.  *See Williams*, 127 S. Ct. at 1063.  Further, the state must establish procedures that clearly instruct the jury and channel its actions in a constitutionally permissible way.  *See id*.

Indeed, every one of the constitutional concerns identified by the *Philip Morris* Court is not only present in the criminal context, but they are also heightened by the serious nature of capital punishment.  First, the Court emphasized that permitting a state to punish a defendant for injuring a nonparty victim would leave the jury without proper standards.  *Philip Morris,* 127 S. Ct. at 1063.  The jury would be "left to speculate" about important aspects of the nonparties' injuries.  *Id.*  The end result would be "arbitrary punishments" or "punishments that reflect not an 'application of law' but 'a decisionmaker's caprice."  *Id.* at 1062 (quoting *Campbell*, 538 U.S. at

---

[8] Indeed, Justice Stevens stated in his dissent that '[t]here is little difference between the justification for a criminal sanction, such as a fine or a term of imprisonment, and an award of punitive damages."  *Id.* at 1066 (Stevens, J. dissenting).

416).  Like the jury deciding punitive damages in *Philip Morris*, a jury deciding the criminal

punishment of a defendant during the punishment phase of a trial does not have proper standards

to analyze unadjudicated offenses.  The jury is often left to absorb testimony and evidence of

alleged, unadjudicated offenses with little guidance as to how to weigh the information in

deciding a punishment.  Without proper safeguards and instruction, a jury during the punishment

phase of a criminal trial is free to punish a defendant for the unadjudicated offenses in violation

of the Due Process Clause and the Supreme Court's holding in *Philip Morris.*

Second, the *Philip Morris* Court noted that allowing a state to punish a defendant for

harm inflicted on nonparties raises the constitutional danger of "lack of notice."  *Id.* at 1063.

Similarly, a defendant facing a punishment in a criminal trial faces the unknown variable of the

surprise introduction of unadjudicated offenses.  The possibility of the jury basing a severe

criminal sentence on unadjudicated offenses allegedly committed by the defendant deprives the

defendant of "fair notice . . . of the severity of the penalty that a State may impose."  *Id.* at 1062

(quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996)).  Under the Due

Process Clause as interpreted by the Supreme Court's holding in *Philip Morris*, this "lack of

notice" is unconstitutional.

Third, as the *Philip Morris* Court firmly stated, a Due Process Clause violation occurs if a

defendant does not have an opportunity to adequately defend himself against the alleged harm

committed against nonparties.  *Id.* at 1063.  Specifically, the "Due Process Clause prohibits a

State from punishing an individual without first providing that individual with 'an opportunity to

present every available defense.'"  *Id.* (quoting *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)).

Likewise, during the punishment phase of a criminal trial, a defendant is not properly equipped

to adequately defend against the introduction of unadjudicated, extraneous offenses.

Unadjudicated, extraneous offenses may include instances where the defendant was never charged with—much less convicted of—the offenses.  Tex. Code Crim. Proc. Art. 37.071. Although defense attorneys are given notice of which offenses the State may present, they are not given additional resources to investigate these unadjudicated, extraneous offenses. Consequently, evidence of unadjudicated, extraneous offenses allegedly committed by the defendant will likely serve as a partial basis for imposing a death sentence.  Allowing the introduction of unadjudicated offenses, in conjunction with the inability of the defendant to adequately defend against these charges, equates to punishment by a state without first providing the defendant with "an opportunity to present every available defense."   This directly offends the Due Process Clause.

*Philip Morris* calls into serious question the heretofore accepted jurisprudence relating to unadjudicated extraneous offenses.  For example, the Texas Court of Criminal Appeals has repeated that evidence of an unadjudicated offense presented at the sentencing phase need not be proved beyond a reasonable doubt.  *Powell v. State*, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994).  Further, "the burden of proof on the State with regards to extraneous offenses is lower when they are offered the punishment phase of a capital trial." *Adanandus v. State,* 866 S.W.2d 210, 233–34 (Tex. Crim. App. 1993).  To be admissible, the state merely needs to "'clearly prov[e]' to the trial court that the extraneous offense was committed and that the defendant was the perpetrator." *Hughes v. State*, 24 S.W.3d 833 (Tex. Crim. App. 2000).  The liberalness of Texas' jurisprudence relating to extraneous offenses does not comply with the United States Supreme Court's insistence in *Philip Morris* that state procedural rules insure that juries not use the evidence improperly.  In particular, Texas law does not sought to insure that juries use evidence of extraneous, unadjudicated offenses solely to assess the defendant's character, rather

than using it as a direct basis for punishment.

**B. By sentencing Petitioner to death, the jury punished Petitioner for harm inflicted on non-parties in violation of the Due Process Clause of the Fourteenth Amendment**

In deciding whether Petitioner would be sentenced to death, the jury considered extensive testimony relating to the harm inflicted by Petitioner on nonparties. All of the testimony regarding extraneous, unadjudicated offenses involved alleged victims that were completely unrelated to the charge brought against Petitioner by the State of Texas. The victims were thus "strangers" to the proceeding, and clearly fall within the *Philip Morris* Court's use of the term "nonparty." In the face of this testimony about harm allegedly inflicted by Garcia on nonparties, the jury's punishment can only be understood as resting, at least in part, on harm inflicted on non-parties. There is evidence to suggest that Petitioner's jury did punish him because of harm he was alleged to have inflicted on third parties; as a result, this Court cannot have confidence that his death sentence is constitutionally reliable or permissible. Petitioner's sentence therefore violates the Due Process Clause.

### 1.  Unadjudicated Extraneous Offenses:

Jason Jett. Jett testified that shortly after midnight on August 31, 1998, he was cleaning out his truck outside a storage facility when he was beaten and robbed of personal items and his truck. R.R. Vol. 21: 36–41. Jett could not identify Garcia. R.R. Vol. 21: 44.

Matthew Henderson. Henderson testified that at 4:10 am on August 31, 1998, he was unloading bags from the backseat of his car when he was robbed and beaten by two individuals, one of whom had a shotgun and one of whom had a knife. R.R. Vol. 21: 60–61. Henderson did not get a good look at either perpetrator. R.R. Vol. 21:61. Like Jett, Henderson could not identify Garcia. R.R. Vol. 21: 61.

Raulot Lockett.  Over defense counsel's objections, Lockett testified that at 5:00 am on August 31, 1998, he was approached by a small, red pickup truck and subsequently robbed by a Hispanic male with a shotgun.  R.R. Vol. 21: 72–76.  Lockett did not describe his assailant and could only say that the individual was wearing a gray hooded sweatshirt.  R.R. Vol. 21:  72, 74–76.  Like Jett and Henderson, Lockett could not identify Garcia.  R.R. Vol. 21: 80.

Bruce Rose.  Rose testified that in the early morning of September 15, 1998, he was burglarized while at home.  R.R. Vol. 21:  84–87.  Items including his keys, wallet, and 1994 teal-green Toyota 4-Runner were stolen.  R.R. Vol. 21: 84–87.  Rose's vandalized car was later discovered.  R.R. Vol. 21: 88.  At no point did Rose have contact with the burglar or burglars.  R.R. Vol. 21: 84–97.  Consequently, like Jett, Henderson, and Lockett, Rose could not identify Garcia.  R.R. Vol. 21: 84–97.

David Venables.   Venables, a Houston police officer, testified that on September 15, 1998, he was approached by a white or Hispanic male, wearing a gray hooded sweatshirt and driving a Toyota 4-Runner.  R.R. Vol. 21: 101.  The individual pointed a handgun at Venables and demanded money.  R.R. Vol. 21: 101.  Venables ducked behind his vehicle, ran towards his house, and heard two gun shots fired.  R.R. Vol. 21: 102–03.  The assailant left in the Toyota 4-Runner, which appeared to have been followed by an old, battered Toyota.  R.R. Vol. 21: 104.  Venables discovered that personal property, including a Remington police shotgun, had been stolen.  R.R. Vol. 21: 105–06.  The shotgun, which was entered into evidence at Garcia's trial, was identified as belonging to Venables.  R.R. Vol. 21: 106.

On cross-examination, Venables admitted that after the robbery, he picked a person out of a police line-up who was not Garcia.  R.R. Vol. 21: 111.  The person Venables picked out of the police line-up was not involved in the robbery.  R.R. Vol. 21: 111.  Like Jett, Henderson,

Lockett, and Rose, Venables could not identify Garcia.  R.R. Vol. 21:  101–11.

Job Gomez.  Gomez testified that he was an acquaintance of Garcia's.  R.R. Vol. 21: 113.
He stated that Garcia gave him a shotgun in September 1998.  R.R. Vol. 21:  114–15.  The
shotgun appeared different at trial than when Gomez first received it.  R.R. Vol. 21:  115.
Specifically, the stock and serial numbers had been removed.  R.R. Vol. 21:  115–16.  Gomez
claimed that Garcia stated he had gotten the shotgun from some cop and made alterations to the
shotgun.  R.R. Vol. 115–16.  The shotgun given to Gomez was the same weapon that Venables
had previously identified.  R.R. Vol. 21:  115.

James Isaac.  Isaac testified that at 3:00 am on September 17, 1998, he was at an ATM
about to make a deposit when he was robbed at gunpoint by two individuals.  R.R. Vol. 21: 129–
30.  They took Isaac's truck and personal property, including his wristwatch.  R.R. Vol. 21: 145.
Det. Beall of the Harris County Sheriff's office subsequently testified that Garcia was wearing a
watch with the name "James C. Isaac" printed across its face when he was arrested.  R.R. Vol.
21: 146–47.  Isaac was unable to describe his assailants' race and could only say that one
assailant was wearing a white hooded sweater or sweatshirt.  R.R. Vol. 21:  131.  Like Jett,
Henderson, Lockett, Rose, and Venables, Isaac could not identify Garcia.  R.R. Vol. 21: 129–34.

Kevin Nunn.  Nunn testified that on September 17, 1998, he was approached by a red
Blazer and robbed at gunpoint by two individuals.  R.R. Vol. 21: 150–51.  The gunman appeared
to have a Hispanic accent, but was masked and therefore could not be identified.  R.R. Vol. 21:
152.  Nunn identified photographs of the Blazer that the robbers were driving.  R.R. Vol. 21:
154–55.  However, like Jett, Henderson, Lockett, Rose, Venables, and Isaac, Nunn could not
identify Garcia.  R.R. Vol. 21: 150–62.

At the conclusion of Nunn's testimony, a juror told him  "Good job."   R.R. Vol. 21: 162.

Nunn thanked the juror.  R.R. Vol. 21: 162.  Defense counsel did not object.  R.R. Vol. 21: 162.

Angie Allen.  Allen testified that on September 20, 1998, she was robbed at gunpoint by a man with a Hispanic accent who was wearing a gray hooded sweatshirt.  R.R. Vol. 21: 166, 170.  She was robbed of personal property such as her purse and jewelry.  R.R. Vol. 21:  168.  Like Jett, Henderson, Lockett, Rose, Venables, Isaac, and Nunn, Allen could not identify Garcia.  R.R. Vol. 21: 170.

Acasio Mesa:  Mesa testified that on September 20, he was sitting in his van when he noticed two men getting out of a small car and walking towards him.  R.R. Vol. 22: 74–75.  One of the men pointed a gun at Casio and fired four times, striking Casio in the arm.  R.R. Vol. 22: 77–78.  Like Jett, Henderson, Lockett, Rose, Venables, Isaac, Nunn, and Allen, Mesa could not identify Garcia.  R.R. Vol. 22: 78.

Benjamin Garcia.  Mr. Benjamin Garcia testified that in September 1998, his van was stolen.  R.R. Vol. 22:  53–54.  Although the van was later returned, Mr. Garcia discovered that the steering column had been broken and that there were items in the van that did not belong to him.  R.R. Vol. 22:  57.  Mr. Garcia turned these items over to the Houston Police Department.  R.R. Vol. 22:  57.  Like Jett, Henderson, Lockett, Rose, Venables, Isaac, Nunn, and Allen, Mr. Garcia could not identify Garcia.  R.R. Vol. 22:  53–57.

Roy Nolin.  Nolin testified that on September 21, 1998, he was robbed at gunpoint by a man in a gray hooded sweatshirt.  R.R. Vol. 22:  60–62.  Since the robber's face was covered, Nolin could only identify the van that the robber used.  R.R. Vol. 22:  64.  The van used in the crime was later identified as being Mr. Garcia's stolen van.  R.R. Vol. 22:  64.  Like Jett, Henderson, Lockett, Rose, Venables, Isaac, Nunn, Allen, and Benjamin Garcia, Nolin could not identify Garcia.  R.R. Vol. 22:  60–64.

44

Ozzie Brown.  Brown testified that on September 21, 1998, he was in his vehicle when a van or truck pulled up behind him.  R.R. Vol. 22:  94–95.  A masked man with a Hispanic accent pointed a gun at Brown and demanded money.  R.R. Vol. 22:  95.  Even though Brown gave the robber $8.00 or $9.00, the robber shot Brown in the mouth when he indicated that he didn't have any jewelry.  R.R. Vol. 22:  95–96. Like Jett, Henderson, Lockett, Rose, Venables, Isaac, Nunn, Allen, Benjamin Garcia, and Nolin, Brown could not identify Garcia.  R.R. Vol. 22: 94–97.

Patrick Meece.  Meece testified that in November 1999, he was an inmate at the Harris County Jail.  R.R. Vol. 21: 179–80.  While incarcerated, he was tied up and beaten by a group of inmates, including Garcia.  R.R. Vol. 21: 181–83.  Meece alleged that Garcia told him that it did not matter if he killed Meece since he was in jail for capital murder.  R.R. Vol. 21: 184.

### 2. The jury impermissibly punished Petitioner for harms inflicted on non-parties, in violation of the Due Process Clause of the Fourteenth Amendment.

In its closing argument, the state referred to Petitioner as a "rampage of terror" and pointed to the number of "broken faces."  R.R. Vol. 25: 6.  As indicated above, however, not a single one of these unadjudicated, extraneous crimes could positively identify Petitioner as the perpetrator.  The extraneous offenses were critical to the state's argument at the punishment phase.  Indeed, in referring to one extraneous unadjudicated offense, the state argued that "for that act alone, [Garcia] should get the death penalty."  R.R. Vol. 25: 8.  Yet this crime was not even the crime for which Mr. Garcia was on trial, or on which he had been charged.  Due Process prohibits a death sentences when the State's sole argument in support of a death sentences is to point to a crime for which the defendant is not even on trial.  .

If this Court believes it is necessary to show prejudice to prevail on this claim, Mr. Garcia should nonetheless prevail because prejudice is clear.  Specifically, at least one juror relied upon the non-party claims to sentence Petitioner to death.  Ms. Landry states that the "testimony about

his other crimes [against non-parties] was very important for me to decide" to sentence Petitioner to death.  Exhibit I (Declaration of Demetta Landry) at 4.   There can be no doubt the non-party offenses testimony influenced the jury's decision.  Indeed, when the state told the jury that Petitioner *should g*et the death penalty for "that act alone," in reference to an extraneous offense, it essentially told the jury that it was permissible to sentence Petitioner to death for an unadjudicated, extraneous offense.

What these statements show is a problem of both the jury and the court. The jurors face the difficulty of considering such evidence in analyzing reprehensibility or future dangerousness while fighting the temptation to base punishment in part on those extraneous offenses. The court must ensure the jury only uses uncharged crimes for permissible purposes. The *Philip Morris* decision warned courts against "procedures that create an unreasonable and unnecessary risk of any such confusion" for what purpose extraneous harm to third parties can be used. *Philip Morris,* 127 S. Ct. at 1065.  As the juror declaration clearly shows, this risk was certainly present in Petitioner's trial. Allowing the jury to hear this evidence without express guidance as to its purpose was "unreasonable and unnecessary" and exposed Petitioner to punishment for harms inflicted upon third parties, violating his constitutional Due Process rights.

III. **Dr. Quijano's testimony that Petitioner's Hispanic heritage was a factor in determining his future dangerousness, which was elicited by Petitioner's own trial counsel, resulted in his being denied effective assistance of counsel and due process of law under the United States and Texas Constitutions.**

During the punishment phase of his trial, Petitioner's trial counsel called Dr. Walter Quijano as an expert witness in clinical psychology.  R.R. Vol. 23: 108.  Dr. Quijano testified that there are several factors that determine a person's dangerousness in society, one of them being race.  R.R. Vol. 23: 112.  Defense counsel and Dr. Quijano had the following exchange during the punishment phase:

Q: Can you tell us what those factors [that contribute to someone's dangerousness in society] are?

A: There are three groups of factors. The first group is called statistical. The second group, called environmental. And the third group, I call clinical.

Q: And can you tell us what is in the first group or cluster of factors, if you will?

A: The first group, called statistical factors, include the age of the person, which is the best predictor of dangerousness. The younger the person, the more dangerous. The older the person, the less dangerous. Prior assaultive crimes or prior assaults is also a strong predictor. The more prior assaults, the more violence in the past, the more dangerous in the future. The use of drugs and alcohol during the commission of these assaultive events increases the probability of violence, and then, finally, the use of a weapon, the presence of which increases dangerousness. The absence of which decreases dangerousness.

Q: Does sex play a role?

A: Sex in the sense of gender plays a role in that males are statistically more violent than females.

Q: What about whether or not someone is black, white, Hispanic? Does that play a role?

A: The race plays a role in that the – among dangerous people, minority people are overrepresented in this population. And, so, blacks and Hispanics are overrepresented in the – in the dangerous – so-called dangerous population.

R.R. Vol. 23: 111–12.

## A. Due Process

In *Furman v. Georgia*, the United States Supreme Court stated that "it would seem to be uncontestable that the death penalty inflicted on one defendant is 'unusual' if it discriminates against him by reason of his race, religion, wealth, social position, or class, or if it is imposed under a procedure that gives room for the play of such prejudices." *Furman v. Georgia*, 408 U.S. 238, 242 (1972). Evidence that emphasizes a defendant's race, ethnicity, or national origin raises important constitutional questions, as well as those of prejudice and relevance. Petitioner's counsel solicited testimony from his own expert witness that Petitioner should be considered more dangerous solely because he is Hispanic. R.R. Vol. 23: 111–12. Violating the

Eighth and Fourteenth Amendments of the United States Constitution, this testimony essentially authorized the jury to sentence Garcia to death because of his race.

Race, religion, or political affiliation are constitutionally impermissible and irrelevant aggravating factors in determining whether to assess the death penalty. *Zant v. Stephens,* 462 U.S. 862, 885 (1983). The Court has further held that in such cases, due process requires that the death penalty be set aside. *Id.*

Dr. Quijano has testified for both the State and for the defense in numerous capital cases. In those instances where he is a State's witness and testifies that race increases a person's dangerousness, courts have called for a new sentencing hearing. For example, in *Broxton v. Johnson*, 2001 U.S. Dist. LEXIS 25715 *1 (S.D. Tex. March 28, 2001), Dr. Quijano testified for the State that race is one of twenty-four factors to be considered when determining future dangerousness. The State confessed error with regard to this claim and agreed that Mr. Broxton was entitled to a new sentencing hearing.

> The Court finds that the introduction of race as an factor to consider with respect to future dangerousness is constitutionally impermissible and totally irrelevant to Texas' special issues. The Court finds that the use of race in the punishment phase violated Broxton's constitutional rights. Due process of law requires that the jury's decision to impose death must be set aside.

*Id*. at *15. In *Saldano v. Dretke*, the State again called Dr. Quijano who testified that one of the twenty-four factors the jury should use in evaluating Mr. Saldano's future dangerousness was race. *Saldano v. Dretke*, 363 F.3d 545 (5th Cir. 2004). Dr. Quijano stated that Hispanics were over-represented in the prison system and found a correlation between race and ethnicity and future dangerousness. *Id*. Mr. Saldano is Hispanic. The Attorney General confessed error in this case and declined to use Saldano's lack of objection at trial as a procedural bar. *Id*. Several other inmates who had been sentenced to death with Dr. Quijano testifying similarly during the

punishment phase have petitioned for federal writs of habeas corpus; the Attorney General has confessed error in each case and the federal courts in each have vacated the sentence, granting a new sentencing hearing.  *See Alba v. Johnson*, 232 F.3d 208 (5th Cir. 2000) (unpublished opinion); *Blue v. Johnson*, No. H-99-0350 (S.D. Tex. Oct. 2, 2000) (unpublished opinion); *Garcia v. Johnson*, No. 99-CV-00134 (E.D. Tex. Sept. 7, 2000) (unpublished opinion).

In order to sentence the Petitioner to death, the jury had to unanimously find that there was a probability he would commit future acts of violence and constitute a continuing threat to society.  Tex. Code Crim. Proc. Art. 37.071 sec. 2(d)(2).  The jury was instructed to consider all the evidence submitted throughout the entire trial and to consider Petitioner's background and character.  Dr. Quijano's testimony essentially explained to the jury that Petitioner was more dangerous solely because of his Hispanic heritage.  Due process requires that the death penalty be set aside if factors such as race, religion, or political affiliation are impermissibly used in determining whether to inflict the death penalty.  *Zant v. Stephens*, 462 U.S. 862, 885 (1983).

### B.  Ineffective assistance of counsel

#### 1.  Legal Standard

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court, recognizing a criminal defendant's Sixth Amendment right to effective assistance of counsel, stated:

> [A] fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the ample opportunity to meet the case of the prosecution to which they are entitled.

*Id*. at 685 (internal citations and quotation marks omitted).  A defendant claiming ineffective assistance of counsel must show that (1) counsel's performance was deficient, falling below an "objective standard of reasonableness," and (2) the deficient performance prejudiced the defense.

*Id*. at 687; *see Bryant v. Scott*, 28 F.3d 1411 (5th Cir. 1994); *Vela v. Estelle*, 708 F.2d 954, 963–64 (5th Cir. 1983), *cert. denied*, 464 U.S. 1053 (1984).

Trial counsel further has a duty to conduct a reasonable investigation. *Wiggins v. Smith*, 539 U.S. 510, 522 (2003). The first prong of *Strickland* requires that there be a showing that counsel's representation fell below an objective standard of reasonableness. *Id*. The second prong requires that the defendant show prejudice, or a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*466 U.S. at 694. The analysis of this "prejudice" must also include an examination of whether counsel's deficient performance caused the outcome to be unreliable or the proceeding to be fundamentally unfair. *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997).

The two-prong *Strickland* test also applies to sentencing proceedings. *Burger v. Kemp*, 483 U.S. 776, 788–96, 107 S. Ct. 3114, 3122–26 (1987). The prejudice prong of the *Strickland* test is satisfied in a capital sentencing proceeding if there is a reasonable probability that, absent counsel's errors, a life sentence would have been imposed. *Strickland*, 466 U.S. at 695; *Carter*, 131 F.3d at 463.

**2. It was deficient performance for trial counsel to elicit testimony from Dr. Quijano that Petitioner was more dangerous simply because of his Hispanic race.**

Defense counsel's actions cannot possibly be categorized as trial strategy. It is clear that counsel was ineffective. Trial counsel solicited the abhorrent testimony from his own expert witness that minorities, specifically blacks and Hispanics, are inherently more dangerous than other races. Whether Dr. Quijano's testimony is solicited by the State or by the defense, it is clear that this race-based testimony instructed the jury to impermissibly use the defendant's race

50

as a factor in determining whether or not he would be a future danger to society.

Petitioner's trial counsel failed to understand or prepare for their own expert witness' testimony.  Dr. Quijano's statistical evidence of racial bias serves no other purpose than to bolster the State's position that Petitioner is a continuing threat to society.  Furthermore, defense counsel put Dr. Quijano on the stand without ever having him interview or examine Petitioner. Consequently, based solely on his own factors and the presence of the unadjudicated, extraneous offenses, the state elicited testimony from Dr. Quijano that "this person is absolutely dangerous." R.R. Vol. 24: 52.

### 3. Trial counsel's deficient performance in eliciting Dr. Quijano's testimony resulted in prejudice to the Petitioner.

The harm Petitioner suffered as the direct result of trial counsel's failure to prepare for the testimony of its own expert witness was significant.  The jury was presented with expert testimony that Petitioner was more dangerous than others simply because he is Hispanic.  In a case such as this, actual bias by a particular juror is not necessary; all that is necessary is the risk that racial prejudice may influence the sentencing decision.  *Turner v. Murray*, 476 U.S. 28, 36 (1986).  It is clear that counsel was deficient in failing to prepare for Dr. Quijano's damning and racially biased testimony.  This testimony, presented to the jury from an "expert", thus giving it more weight, stated that individuals of Petitioner's race are inherently more dangerous than others.

Texas courts have had the opportunity to review the impropriety of Dr. Quijano's testimony when it is elicited by the prosecution. *Saldano v. State*, 70 S.W.3d 873, 884-884 (Tex. 2002).  In *Saldano,* the court reasoned that the defendant counteracted the doctor's testimony on cross-examination and by offering the defense's own witness. *Id.* at 885.  Dr. Quijano's testimony in Petitioner's case was significantly more harmful, however, because the evidence

was introduced by the defense itself – meaning that the jury was never able to hear any cross examination on the point made by Dr. Quijano that race was in some way evidence of future dangerousness.  Further, as Dr. Quijano was the defense's expert, there was no countering of his testimony through additional witnesses.  This gross constitutional violation, which would be absolutely impermissible and reversible error if elicited by the State, should not be allowed to condemn Petitioner simply because his counsel is the one who called Dr. Quijano to the witness stand.

This Court is not precluded from granting relief, and 28 U.S.C. section 2254 (d), has been satisfied, and because the state court's decision was contrary to clearly established federal law and based on an unreasonable determination in light of the evidence presented.

## IV. Petitioner was deprived of the effective assistance of counsel in the sentencing phase of his capital murder trial.

### A. The clearly-established controlling precedent with respect to ineffective assistance of counsel.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the U.S. Supreme Court held that to establish a claim ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.  To prove that counsel was deficient requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*.  To show prejudice, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*.

The standard for ineffective assistance of counsel claims established in *Strickland* applies to claims where trial counsel fails to discover mitigating evidence at the sentencing phase of trial.

In such cases, the inquiry into whether counsel was "functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" turns not on the single issue of whether counsel should have presented a mitigation case, but whether the investigation supporting counsel's decision not to introduce mitigating evidence is *itself reasonable*. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). The principle that any decision to limit investigation must be reasonable under the circumstances of the case is rooted in *Strickland*. *See Strickland*, 466 U.S. at 690 (strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation).

Prevailing norms of practice, such as those reflected by the American Bar Association, are guides to determining what conduct is reasonable. *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 395 (2000). Specifically, the Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). American Bar Association, Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.4, 10.7, 10.11, *available at* www.abanet.org/deathpenalty (hereinafter 2003 Revised ABA Guidelines). The previous Guidelines, adopted in 1989, similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." American Bar Association, ABA Guidelines for the Appointment and Performance of Defense

Counsel in Death Penalty Cases 11.4.1 (1989). (hereinafter 1989 Guidelines) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation". *Id*. at 11.4.1.(7). The 1989 ABA Guidelines were recognized by the U.S. Supreme Court in *Wiggins* as "well-defined norms." *Wiggins*, 539 U.S. at 524. "The new ABA Guidelines adopted in 2003 simply explain in greater detail than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482 at 487 (6th Cir. 2003).

The 2003 Revised ABA Guidelines also provide that "counsel at every stage have an obligation to conduct thorough and independent investigations relating to issues of both guilt and penalty." American Bar Association, Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7(A) (2003).  Investigations of mitigating evidence necessarily include considering

> witnesses familiar with and evidence relating to the client's life and development, ***from conception to the time of sentencing***, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death.

> Expert and lay witnesses along with supporting documentation (e.g. school records, military records) to provide medical, psychological, sociological, cultural, or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s)...

*Id*. at 10.11(F)(1)-(2) (emphasis added).

The State Bar of Texas Guidelines and Standards for Texas Capital Counsel, which closely mirror the ABA Guidelines, provide that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." State Bar of Texas, State Bar of Texas Guidelines and Standards for Texas Capital Counsel

11.1(A), p. 15 (April 21, 2006). Investigation at the penalty phase should include:

> (i.) Development of character witnesses and family background evidence, and where applicable, relevant records and witnesses from additional sources, including military, school, hospital, past employment, etc., to corroborate the mitigating theory;

> (ii.) Development of expert witnesses on mental health issues, if any;

> (iii.) Development of rebuttal witnesses for State's extraneous evidence, if any.

*Id*. at 11.1(A)(3)(b)(i.)-(iii.).[4]

The prejudice inquiry for an ineffective assistance of counsel claim is not outcome determinative. The *Strickland* Court itself expressly rejected an "outcome determinative standard" requiring the defendant to show that counsel's deficient conduct "more likely than not altered the outcome" of the case. *Strickland*, 466 U.S. at 693-94. Instead, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, ***even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome***." *Id*. (emphasis supplied). Thus, the "reasonable probability" standard—a probability sufficient to undermine confidence in the outcome—is a less onerous burden than even the preponderance of the evidence standard.[5] The Supreme Court reiterated this point in *Williams v. Taylor*, 529 U.S. 362 (2000), expressly noting that a state court's use of a preponderance of the

---

[4]   While these guidelines were not in effect at the time of trial, their adoption is so close to the time so as to evidence the prevailing norms of practice at the trial. In any event, the Supreme Court has judged lawyers by ABA standards that were adopted after the trial. *Rompilla v. Beard*, 545 U.S. 374, 376 fn.7 (2005).

[5]   In *Bouchillon v. Collins*, 907 F.2d 589 (5th Cir. 1990), the Fifth Circuit observed that the prejudice prong imposes "a lower burden of proof than the preponderance standard." *Bouchillon,* 907 F.2d at 595. Even when "the evidence arguably supports a different result under a preponderance standard," a reviewing court still can be "confident that it meets the 'reasonable probability' standard." *Id*; *see also Buckner v. Polk*, 453 U.S. 195, 203 (4th Cir. 2006) (reciting *Strickland* prejudice standard of "reasonable probability" as "somewhat less than a preponderance of the evidence"); *Hodge v. Hurley*, 426 F.3d 368, 376 n. 18 (6th Cir. 2005) (*Strickland* standard "is a lesser standard than preponderance of the evidence").

evidence standard rather than the lesser reasonable probability standard would result in a

decision that was contrary to federal law as determined by that Court.   *Id*. at 405-06.

Specifically, the Court stated that:

> If a state court were to reject a prisoner s claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be diametrically different,  opposite in character or nature, and mutually opposed to our clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a reasonable probability that ... the result of the proceeding would have been different.

*Id*.

The Texas CCA affirmed the above analytical framework for reviewing the prejudice

prong of an ineffective assistance claim in the punishment phase of a Texas capital trial in *Ex*

*parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006).  There, the Texas Court specified that:

> the applicant must show that counsel's performance prejudiced his defense at trial.  In order to satisfy this prong, an applicant must show there was a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.  Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances.  It asks the jury to answer a mitigation issue.  We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Gonzales*, 204 S.W.3d at 393-94 (footnotes omitted).  In making the prejudice inquiry, the Court

"consider[s] the totality of the evidence, 'both that adduced at trial, and the evidence adduced in

the habeas proceeding.'"  *Id*. at 398 (citing *Wiggins*, 539 U.S. at 534).   The Court determined

that Gonzales had suffered prejudice from his counsel's failure to locate and present mitigating

evidence because "the applicant's mitigating evidence, taken as a whole, 'might well have

influenced the jury's appraisal' of the applicant's moral culpability."   *Id*. at 399 (quoting and

citing *Wiggins*, 539 U.S. at 538).

From 2000 to 2005, the U.S. Supreme Court accepted three cases to address effective representation at the sentencing phase of a capital trial. *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000). This trio of decisions addressed death penalty cases tried in the 1980's, and the Court held in each instance that the clearly established law of *Strickland* mandated a finding of ineffective assistance of counsel and thus the AEDPA posed no bar to relief.

While *Rompilla*, *Wiggins*, and *Williams* are not ground-breaking in the sense that they represent clearly-established law, they provide a detailed set of instructions to lower courts on the proper application of *Strickland* to capital sentencing proceedings. That the Court deemed such instruction necessary is evident from the fact that it devoted its scarce resources to taking— not one but—three, relatively speaking, unremarkable capital cases and modeling how to adjudicate claims of ineffective assistance of counsel. The Court scrupulously enforced the right to effective assistance of counsel in capital sentencing proceedings, even under the deferential scheme of AEDPA.

Just as its decisions in *Tennard v. Dretke*, 542 U.S. 274 (2004), *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007), and *Brewer v. Quarterman*, 550 U.S. 286 (2007), reanimated the rule of *Penry v. Lynaugh*, 492 U.S. 302 (1989), after a decade-and-a-half of lower court precedent had rendered it essentially dead letter, this trio of decisions reflects the Court's strong dissatisfaction with the direction of lower court Sixth Amendment jurisprudence during the sixteen years following *Strickland*. They likewise overturn a vast body of inconsistent lower court cases that had accumulated during the interim.

In *Williams v. Taylor*, 592 U.S. at 362, the U.S. Supreme Court assessed Williams' 1986 capital trial through the prism of clearly established Supreme Court precedent as of the Virginia

Supreme Court's 1997 decision to deny habeas corpus relief.

During the sentencing phase of the trial, Williams' counsel presented the testimony of Williams' mother, two neighbors, and a taped statement by a psychiatrist.  *Id*. at 369.  The Supreme Court concluded that trial counsel's performance was below professional norms because they failed to investigate and discover extensive records describing Williams' childhood. *Id*. at 395.  This failure was not based on any strategic calculation.  Counsel mistakenly believed that any such records would not have been admissible.  *Id*.

The Court noted, as is frequently true of a capital defendant's juvenile history, that "not all of the additional evidence was favorable to" the defendant.  *Id*. at 396.  In fact, Williams' records revealed additional criminal offenses for which he was incarcerated as a juvenile, including aiding and abetting larceny at age eleven, pulling a false fire alarm at age twelve, and breaking and entering at age fifteen.  *Id*.  However, the failure to introduce records that were never located and reviewed by trial counsel could not have been based on strategic considerations related to the negative information in the records.

> [T]he failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession.   Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not fulfill their ***obligation*** to conduct a thorough investigation of the defendant's background.  *See* 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980).

*Id*. (emphasis added).

After concluding that counsel's failure to conduct a thorough social history investigation was deficient, the Court determined that Williams was prejudiced by his counsels' omissions. Available social history records contained compelling information about Williams' background. *Id*. at 395-96 (citations and footnote omitted).  Specifically, the jury would have discovered that

Williams had suffered extensive physical abuse by both his parents and foster parents; that Williams was borderline mentally retarded and did not advance beyond the sixth grade; that prison officials did not regard Williams as a future danger; that Williams had assisted prison officials while incarcerated; and that Williams was doing well in the structured prison environment, becoming part of the prison ministry program and earning a carpentry degree. *Id.*

When assessing the potential impact of the mitigating evidence, the *Williams* Court emphasized that whether the mitigating evidence might have resulted in a different outcome is an entirely separate question from whether it negates future dangerousness or the prosecution's case for death eligibility. *Id.* at 398. Specifically, "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, *even if it does not undermine or rebut the prosecution's death-eligibility case*."[9] *Id.* (emphasis added). Thus, the Court made it clear that prejudice inures even if the omitted evidence does not rebut the State's case for death eligibility. The question is not whether there is sufficient evidence to justify a death sentence; rather, it is whether the totality of the mitigating evidence "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Williams*, 529 U.S. at 398; *see e.g. Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995) (the *Brady* and *Strickland* prejudice test is "not a sufficiency of evidence test").

As the Court noted, either Williams's tragic childhood or his borderline mental retardation was sufficient to justify a finding of *Strickland* prejudice, even though the prosecution proved that Williams was very dangerous defendant who had repeatedly committed

---

[9] This is particularly true in Texas cases because the jury is asked to assess the defendant's future dangerousness in the first special issue. The jury proceeds to the second special issue only if it unanimously determines that the defendant may pose a future danger. *Id.* The second special issue is an entirely separate and distinct inquiry into the defendant's moral culpability in light of any mitigating evidence.

vicious crimes. *Williams*, 529 U.S. at 398. The Virginia Supreme Court's conclusion to the contrary that Williams had not shown prejudice "was unreasonable in at least two respects." *Id*. at 397.  First, it had mistakenly read *Lockhart v. Fretwell*, 506 U.S. 364 (1993), as having grafted on an additional requirement to *Strickland's* test for prejudice.  *Id*.  Second, "the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Id*. at 397-98; *see also id.* at 416 (O'Connor, J., concurring) (the Virginia Supreme Court's application of Strickland was unreasonable because of the "failure to consider the totality of the omitted mitigation evidence.").

Three years following its decision in *Williams*, the Court revisited the issue of capital defense investigation and representation in *Wiggins v. Smith*, 529 U.S. 510 (2003).  Wiggins was convicted of drowning 77-year-old Florence Lacs in her bathtub and ransacking her apartment. *Id*. at 514.  In preparation for the sentencing proceeding, trial counsel investigated and developed mitigating evidence, including "psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other."  *Id*. at 516.  "At no point did [trial counsel] proffer any evidence of petitioner's life history or family background."  *Id*.

In post-conviction proceedings, Wiggins "challenged the adequacy of his representation at sentencing, arguing that his attorneys had rendered constitutionally defective assistance by failing to investigate and present mitigating evidence of his dysfunctional background."  *Id*. Specifically, mitigating evidence would have shown that Wiggins had suffered long-term,

extensive physical and sexual abuse by his alcoholic mother, several sets of foster parents and foster siblings, and even his Job Corps supervisor. *Id*. at 516-17.

Wiggins' trial counsel acknowledged that he did not retain "a forensic social worker to prepare a social history, even though the State made funds available for that purpose." *Id*. at 517. The Maryland Court of Appeals held that trial counsel made "'a deliberate, tactical decision to concentrate their effort at convincing the jury' that appellant was not directly responsible for the murder." *Id*. at 518 (quoting *Wiggins v. State*, 724 A.2d 1, 15 (Md. 1999)). Trial counsel "knew of Wiggins' unfortunate childhood" and had "'social service records that recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, and borderline retardation.'" *Id*. (quoting *Wiggins*, 724 A.2d at 15). The Maryland court "acknowledged that this evidence was neither as detailed nor as graphic as the history elaborated in a subsequent report but emphasized that 'counsel did investigate and were aware of appellant's background.'" *Id*. (quoting 724 A.2d at 16 (deleting emphasis in original)). Because counsel knew that "at least one uncontested mitigating factor—Wiggins' lack of prior convictions—would be before the jury should their attempt to disprove Wiggins' direct responsibility for the murder fail," the state court concluded that trial counsel "'made a reasoned choice to proceed with what they thought was their best defense.'" *Id*. (quoting 724 A.2d at 17).

The federal district court granted habeas corpus relief but the Fourth Circuit reversed, holding that counsel "had made a reasonable strategic decision to focus on petitioner's direct responsibility." *Id*. at 519. Counsel knew "at least some details of Wiggins' childhood," though the Fourth Circuit "acknowledged that counsel likely knew further investigation 'would have resulted in more sordid details surfacing.'" *Id*. Counsel's knowledge was thus sufficient to make an informed strategic decision. *Id*.

Justice O'Connor, writing for a seven-member majority of the Court, concluded that Wiggins' counsel were ineffective during his 1989 capital trial because their investigation failed to satisfy *Strickland's* performance standards, and the Maryland court's conclusion to the contrary was objectively unreasonable. *Id*. at 510.

After identifying the two-part *Strickland* test as controlling, the Court emphasized that "failure to uncover and present voluminous mitigating evidence" could not be excused as trial counsel's tactical decision.  *Id*. at 522.  Rather, this failure indicated trial counsel had failed in their obligation to thoroughly investigate the defendant's history and background. *Id*.  The Court emphasized counsel's duty to investigate by referring to the ABA Standards for Criminal Justice. *Id*.

Because Wiggins' complaint was that his counsel failed to conduct a thorough social history investigation, the Court's "principal concern in deciding whether [trial counsel] exercised 'reasonable professional judgmen[t],' [] is not whether counsel should have presented a mitigation case.  Rather, [the Court] focus[ed] on whether the ***investigation*** supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was ***itself reasonable***." *Id*. at 522-23 (quoting *Strickland*, at 691) (emphasis added and in the original).

The Court then cataloged the investigative efforts of Wiggins' counsel.  Counsel retained a psychologist who evaluated Wiggins and determined that he had a low IQ, "difficulty coping with demanding situations," and features of a personality disorder.  *Id*. at 523.  Counsel had a pre-sentencing report, which included a one-page personal history noting Wiggins' "misery as a youth," his self-reported "disgusting" background, and noting that he had spent most of his life in foster care.  *Id*.  Counsel also located and obtained Baltimore's Department of Social Services records documenting Wiggins' placements in foster care.  *Id*.

The Court held that "counsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989." *Id*. More specifically, the Court faulted counsel for obtaining only a rudimentary understanding of Wiggin's social history from a narrow range of sources before making their allegedly strategic decision. *Id*. at 524-25. The existence of extensive records regarding Wiggins' extensive, long-standing physical and sexual abuse indicated that the scope of trial counsel's investigation was unreasonable. *Id*. Moreover, counsel's actions during trial indicated that they acted deficiently and were not executing trial strategy. *Id*. at 526. For example, trial counsel referenced Wiggins' "difficult life" during opening arguments, then failed to present any relevant testimony. *Id*.

The Court concluded that "the 'strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id*. at 526-27.[10] Just because trial counsel had *some* information regarding Wiggins' personal history, it should not be assumed that they were in a position to be able to make a tactical decision with respect to a mitigation defense. *Id*. at 527. Rather, the issue is whether a reasonable attorney would perform additional investigation, in light of the presently-available

---

[10] The Supreme Court's willingness to subject the state court's finding of trial strategy to careful scrutiny in light of the actual record, and determine that it is more likely a *post hoc* rationalization of trial counsel's conduct, is consistent with the Supreme Court's admonition that the AEDPA "deference" does not require judicial abdication:

> Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). In *Wiggins*, as in *Miller-El*, the Supreme Court demonstrated how to apply the AEDPA. A state court finding of trial strategy does not insulate counsel's performance from federal review. Federal courts must scrutinize the finding in light of the record as a whole.

evidence. *Id*. Consequently, the state court unreasonably had applied *Strickland* because it was excessively deferential to counsel's invocation of strategy by failing to examine whether they were justified in making such decisions. *Id*. at 527-28.   In reaching its holding, the Court evaluated "the totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceeding[s].*'" *Id*. (quoting *Williams v. Taylor*, 529 U.S., at 397-398, 120 S.Ct. 1495) (emphasis added) (citation omitted).

Two years later, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Court held trial counsel must make reasonable attempts to obtain and assess mitigating evidence, even if a defendant and his family have suggested that none is available. *Rompilla*, 545 U.S. at 377.

Ronald Rompilla was sentenced to death for the 1988 murder of James Scanlon. *Id*. at 375.   Mr. Scanlon was discovered dead outside of his bar, after he had been stabbed repeatedly and then set on fire. *Id*. One of the three aggravating factors justifying Rompilla's death sentence was that the murder was committed by torture.   *Id*. at 378.   In finding the evidence sufficient to uphold the jury's finding of a torture-killing, the state court cited to the medical examiner's testimony:

> Dr. Isidore Mihalakis, a forensic pathologist, testified at the sentencing hearing that the victim was alive during the infliction of almost all of the injuries that he received.   []   These injuries included abrasions, lacerations, blunt force injuries, a fractured nose, and multiple stab wounds.   []   Dr. Mihalakis further testified that the number and location of the various wounds on the victim's body were indicative of injuries that were inflicted with the intent of causing pain.

*Commonwealth v. Rompilla*, 653 A.2d 626, 634 (Pa. 1995) (citations omitted).   In addition to torture, the jury also found that the murder was committed in the course of another felony and that Rompilla had a "significant history of felony convictions indicating the use or threat of violence." *Rompilla*, 534 U.S. at 378.   In support of the latter aggravating factor, the prosecution presented evidence of a burglary and that Rompilla raped a woman at knifepoint. *Rompilla*, 653

A.2d at 633. An assistant district attorney read the rape victim's testimony to Rompilla's jury in the sentencing phase of his capital trial. *Id*.

The defense's punishment phase case consisted of five family members who, for the most part, begged the jury for mercy, saying that they loved Rompilla and thought he was an innocent, good man. *Rompilla*, 545 U.S. at 378. Rompilla sought post-conviction relief in state court on the basis that the defense failed to present "significant mitigating evidence about Rompilla's childhood, mental capacity and health, and alcoholism," but the state court deemed sufficient trial counsels' investigation. *Id*.

The federal district court held that the state court had unreasonably applied *Strickland v. Washington* and granted habeas corpus relief, due to fairly obvious signs that Rompilla had a troubled childhood, suffered from mental illness and alcoholism. *Id*. at 379. Moreover, defense counsel had unjustifiably relied on Rompilla's own description of his personal history when determining whether to conduct a mitigation investigation. *Id*. A divided panel of the Third Circuit reversed. The panel acknowledged that trial counsel failed to discover mitigating evidence located in Rompilla's school, medical, police, and prison records, but it held that—based on the information they had—trial counsel were justified in failing to look. *Id*. Thus, unlike the case in *Wiggins*, where counsel ignored obvious leads, Rompilla's counsel did enough to reasonably conclude that further investigation would be a waste of limited resources. *Id*. Nonetheless, the Court found trial counsels' investigation deficient because they failed to examine the public files on Rompilla's prior conviction that they knew would be used to support the prosecution's case for a death sentence. *Id*. at 383. The Court held that reasonably diligent counsel must obtain all available evidence related to the prosecution's case in aggravation. *Id*. at 385-86. In so holding, the Court again relied on the ABA Guidelines for the standard of care,

and emphatically rejected the state court's conclusion that trial counsel were excused from looking at the case files based on their other efforts to seek mitigation. *Id*. at 397, 389.

With respect to *Strickland*'s prejudice inquiry, the Court indicated that if trial counsel had inspected the files on Rompilla's prior conviction, they would have discovered "a range of leads that no other source had opened up." *Id*. at 390. Additionally, the information would have dislodged the incomplete and/or inaccurate information provided by Rompilla and his family. *Id*. at 391-92.

Proper application of these principles to a Texas capital case is demonstrated by the Fifth Circuit's decision in *Walbey v. Quarterman*, 309 Fed.Appx. 795 (5th Cir. 2009), *available at* 2008 WL 5972180 (5th Cir. 2008) (unpublished). Gaylon Walbey was sentenced to death in 1994 for breaking into Marionette Beyah's home and strangling, beating, and stabbing her to death with an extension cord, fire extinguisher and several different knives. *Walbey v. State*, 926 S.W.2d 307, 308-09 (Tex. Crim. App. 1996). In preparation for the punishment phase of the case, trial counsel had obtained and reviewed documents relating to Walbey's background. *Walbey*, 309 Fed.Appx. at 796. Trial counsel had also retained and presented the testimony of two psychologists during sentencing. *Id*. Counsel, however, did not begin his sentencing investigation or retain his primary expert until a week before trial, and did not thoroughly review the documents he had obtained. *Id*. at 796, 801.

At sentencing, Walbey's trial counsel presented some evidence of Walbey's troubled, abuse-filled childhood and expert testimony that Walbey would not be a future danger to society. *Id*. at 795. However, following Walbey's his conviction and death sentence, his post-conviction counsel discovered a plethora of additional mitigating evidence that "describe[d] a nightmarish hell of cruelty and neglect." *Id*. at 797. The evidence indicated that Walbey was made to drink

beer and smoke "joints" by ages two and a half to three and was left alone with unexplained marks on his body during the same time; was found wandering alone along a highway service road at age five; was kidnapped by his father—who abused his mother and had a drug and alcohol addiction—and hidden from his mother from ages five to ten; was repeatedly physically and mentally abused by his parents and paternal grandmother; was forced to eat garbage while living in abandoned houses when he was locked out by (or ran away from) his father during the period of his kidnapping; was reunited with his mother after being discovered in an orphanage; was hospitalized with a possible diagnosis of schizophrenia at age twelve, but did not receive the recommended follow-up care for that diagnosis because his mother "did not have the time". *Id.* The evidence also indicated that Walbey had known the victim through a foster parent program. *Id.* at 798. After initially accepting Walbey, the victim had returned him to the youth center several months later with the explanation that she was going on vacation; she never returned for him, and Walbey was told that she did not want him back. *Id.*

The Fifth Circuit first held that there was "little room for debate" that trial counsel's mitigation investigation was deficient, calling it "severely limited." *Id.* at 800. In light of the "case law that firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history," the *Walbey* Court faulted trial counsel because he did not (1) interview Walbey's mother or people who worked with him as a youth, (2) hire a mitigation expert, (3) reach an independent conclusion about the viability of a mitigation defense, instead delegating that task to an expert, which expert understood his role as limited to assessing only future dangerousness and spent two hours preparing the case, *or* (4) investigate the history of Walbey's relationship with the victim. *Id.* at 800-01. Despite counsel's investigation into and presentation of Walbey's maternal

grandmother, two former foster parents, and two psychological experts, "[t]here was essentially no effective investigation of the mitigation issue." *Id*. at 801. Moreover,

> [g]iven the Texas law establishing that the facts of Walbey's crime are themselves legally sufficient to support a finding of future dangerousness, the virtually impossible battle that Ezell faced on future dangerousness makes all the more unreasonable Ezell's failure to investigate a mitigation defense thoroughly. ... Neither can there be any contention that the facts of Walbey's childhood were hidden or difficult to find; in fact, many were contained in a box delivered to Ezell by the district attorney that Ezell elected only to skim. Ezell's mere possession of "some information with respect to petitioner's background ... [did not put him] in a position to make a tactical choice not to present a mitigation defense."

*Id*. (quoting *Wiggins*, 539 U.S. at 527). The Court further held that the Texas Court of Criminal Appeals' conclusion that counsel did not perform deficiently was an objectively unreasonable application of *Williams*. *Id*.

The district court had held that there was no prejudice due to trial counsel's deficient performance, because Walbey's trial counsel had "outlined the same mitigating factors for the jury as Walbey now contends should have been presented." *Id*. at 802. Despite counsel's presentation of a substantial part of Walbey's abusive and neglectful childhood, however, the Fifth Circuit disagreed. *Id*. The *Walbey* court again relied on *Williams*, characterizing the decision as "stand[ing] for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Id*.

> The fact that the presentation of some mitigation evidence does not necessarily defeat a prejudice showing is also clear from the test that *Williams* establishes. There, the Court held that it is an unreasonable application of Supreme Court precedents for a state court not to "evaluate the totality of the available mitigation evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding." This standard clearly contemplates that even when *some* mitigating evidence is presented at trial, prejudice is still possible if that evidence is substantially incomplete.

*Id.* (emphasis in original).

Finally, the *Walbey* court rebuffed two additional arguments made by Texas in support of the district court's determination that Walbey was not prejudiced.  First, it rejected "the State's stereotypical fall-back argument" that the heinous and egregious nature of the crime itself would have ensured assessment of the death penalty even absent the deficiency.  *Id.* at 804 (quoting *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001)).  That argument "eviscerat[es] the Supreme Court-approved Texas 'special issues' scheme" and "would be to return to the days of inflicting capital punishment based on emotion and revenge, supplanting altogether the questions of deliberateness and future dangerousness which make the Texas scheme constitutional."[11]  *Id.* Moreover,

> Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief ... would virtually never be available, so testing for it would amount to a hollow judicial act.

*Id.*  Second, the *Walbey* court noted that Texas's argument that prejudice could not be shown because the mitigating evidence contained both helpful and aggravating was foreclosed by *Williams*.  Ultimately, the mitigating evidence Walbey's trial counsel's deficient investigation failed to discover was "sufficient to create a reasonable probability that one juror would have voted for life in prison rather than death," and "[i]t was unreasonable under *Williams* for the TCCA to conclude otherwise."  *Id.* at 806.

---

[11]  Additionally, jurors are allowed to take into consideration the facts of the crime under the theory that the evidence is relevant to the future dangerousness special issue.  *Muniz v. State*, 573 S.W.2d 792, 795 (Tex. Crim. App. 1978).  However, the future dangerousness special issue and mitigation special issue are ***entirely distinct*** questions.  Aggravation and mitigation are not weighed by a Texas capital sentencing jury.  Consequently, the question of aggravation is not a legally relevant consideration to the prejudice component of an ineffective assistance of counsel claim for failing to conduct a reasonable mitigation investigation and present a reasonable mitigation case.

To the extent that previous lower court decisions failed to derive the above principles from *Williams*, *Wiggins*, and *Rompilla*, they are no longer valid precedent. Federal courts adjudicating claims of ineffective sentencing-phase defense in capital cases should be wary of relying on decisions made without the benefit of the Supreme Court's guidance in *Williams*, *Wiggins*, and *Rompilla*.

**B.     Defense's failure to conduct a reasonable mitigation investigation and to discover relevant mitigating evidence fell below an objective standard of reasonableness pursuant to prevailing professional norms.**

**1.     Professional standard with respect to investigating mitigating evidence in capital sentencing**

In capital sentencing, the U.S. Supreme Court has held that the Eighth and Fourteenth Amendments require that sentencing procedures focus on the crime's particularized nature, while permitting for the particularized consideration of a defendant's character and record. *Gregg v. Georgia*, 428 U.S. 153, 206 (1976) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976). The Eighth Amendment requires that the sentencer, *as a matter of law*, must be permitted to consider—and indeed must consider—all mitigating evidence offered as a basis for a sentence less than death. *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978); Relevant mitigating evidence is not limited to evidence that would "relate specifically to petitioner's culpability for the crime he committed." *Skipper*, 476 U.S. at 4. Nor does there have to be shown that the crime was attributable to the mitigating evidence. *Tennard v. Dretke*, 542 U.S. 274, 286, 289 (2004). The only relevant factor is whether the proffered evidence might form a basis of a sentence less than death. *Lockett*, 438 U.S. at 604.

In essence, the fundamental Eighth Amendment premise is that if the sentencer fails to consider "those compassionate or mitigating factors stemming from the diverse frailties of humankind," an unacceptable risk exists that the death penalty will be imposed in spite of factors

that warrant a less severe penalty.  *Woodson*, 428 U.S. at 304.  A jury can consider evidence in mitigation, however, only if trial defense counsel vigorously investigates and presents the available evidence. Courts have indicated that given the potentially broad scope of mitigating evidence that juries may consider, defense counsel are under a greater obligation to discover and evaluate mitigating evidence than they are to discover evidence relating to the guilt-innocence phase. *Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006); *United States ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996).  Such mitigating evidence permits juries to determine whether there might be a basis for them to exercise mercy.  *Battenfield v. Gibson*, 236 F.3d 1215, 1229 (10th Cir. 2001).

The ABA Guidelines provide the framework within which counsel performs in ensuring that constitutionally relevant and necessary evidence is presented to the sentencing jury.  As soon as counsel enters a capital case, he should immediately begin an investigation to locate all reasonably available mitigating evidence with the assistance of trained investigators, such as mitigation specialists.  2003 ABA Guideline 4.1.A.1; 1989 ABA Guidelines 11.4.1A, 11.4.1C, 11.8.3A.[12]  This investigation is vital given the death penalty's unique nature.  *Id.* at 11.4.1 Commentary.

It is insufficient for counsel to perform a limited investigation.  *Lambright v. Schriro*, 490 F.3d 1103, 1120 (9th Cir. 2007).  Rather, counsel must investigate all aspects of the defendant's

---

[12] "The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; . . . and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation." 2003 ABA Guideline 4.1 Commentary.

life, including:   physical history, psychological history, social history, and familial history.[13] 1989 ABA Guideline 11.3.1.D.2.   Counsel must also interview witnesses familiar with the defendant's life who could testify as to potential mitigating evidence.  *Id*. at 11.3.1.D.3.

The standard of care established by the Texas State Bar may also inform this Court's assessment.  In 2006, the State Bar of Texas published its Guidelines and Standards for Texas Capital Counsel (SBOT Guidelines).  69 Tex. Bar J. 966 (2006).    SBOT Guideline 3.1(A) provides that *at a minimum*, the defense team should include:  two qualified capital defense attorneys, a private investigator, and a mitigation specialist.  *Id*.  At least one team member should be qualified to screen for potential mental or psychological disorders and/or impairments. *Id*.

The SBOT Guidelines echo the 2003 ABA Guidelines and the Supreme Court's decision in *Rompilla v. Beard*, 545 U.S. 374 (2005), with respect to trial counsel's duty to investigate mitigating evidence.  This evidence generally includes:

|   |   |
|---|---|
| i. | Development of character witnesses and family background evidence, and where applicable, relevant records and witnesses from additional sources, including military, school, hospital, past employment, etc., to corroborate mitigating evidence theory; |
| ii. | Development of expert witnesses on mental health issues, if any; |
| iii. | Development of rebuttal witnesses for State's extraneous offenses, if any; |
| iv. | Development of the defendant's testimony, if necessary; |
| v. | Planning of cross examination of State witnesses; |
| vi. | Preparation for jury charge issues; or, |
| vii. | Preparation of final argument. |

*Id*. (Guideline 11.1(A)(3)).

Finally, the SBOT Guidelines require counsel's investigation to have produced sufficient

---

[13] This may include—but is not limited to—determining whether the defendant has suffered physical illness/injuries, mental illness/injuries, birth trauma, developmental delays, and/or alcohol/drug use. 1989 ABA Guideline 11.3.1.D.2

information to allow counsel to consider presentation of the following kinds of evidence: (1) witnesses familiar with and evidence relating to the client's life and development, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutors, would present positive aspects of the client's life, or would otherwise support a sentence less than death; (2) expert and lay witnesses along with supporting documentation (e.g., school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs, or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor; (3) witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served; (4) witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones; and (5) demonstrative evidence, such as photos, videos, and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts, and letters of praise or reference. *Id*. at 974 (Guideline 11.7(F).

Professional standards of Texas capital defense counsel may also be discerned through the Texas CCA decision in *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006)  After the completion of Gonzales' 1997 capital murder trial, post-conviction counsel discovered through interviews with Gonzales's family that Gonzales had been physically and sexually abused as a child.  *Id*. at 393-94.  Although Gonzales's trial counsel had interviewed both

Gonzales's mother and sister about Gonzales's background—the latter of whom even testified at

punishment to Gonzales's difficult childhood and his borderline mental retardation—Gonzales's

trial counsel never specifically inquired into whether Gonzales had been abused with these

potential witnesses and thus did not present evidence of abuse at sentencing. *Id*. at 394-95. The

CCA held that this failure to investigate and inquire into the subject of abuse when interviewing

the client and relevant witnesses fell below an objective standard of reasonableness for Texas

capital trial counsel in 1997 and rendered trial counsel's mitigation investigation unreasonable.[14]

---

[14] Judge Cochran's concurring opinion expanded upon the professional norms in place in Texas capital sentencing proceedings in 1997:

> The underlying message of *Summerlin* [*v. Schriro*, 427 F.3d 623 (9th Cir. 2005)] is that defense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty. The failure to investigate will not be excused simply because the defendant failed to mention such evidence himself. Indeed, under *Rompilla v. Beard*, defense counsel may be required to investigate potential mitigating facts even when the defendant is "uninterested in helping" or is "even actively obstructive" in developing a mitigation defense.

> Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the "circumstances of the offense, the defendant's character and background, and [any evidence that lessens] the personal moral culpability of the defendant[.]" At a minimum, defense counsel must privately quiz his client about any and all positive and negative facts about the defendant's upbringing, personality, social interactions, thoughts and feelings. It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, defense counsel must be armed with a comprehensive check-list of possibilities, and forcefully inquire about each topic. Such topics might include:

> - Childhood accidents and injuries;
> - Trips to the emergency room;
> - Serious illnesses at any time;
> - Physical abuse to the defendant or any other member of the family;
> - Any sexual abuse to the defendant or any other member of the family;
> - Size of the immediate family, and a history of the physical, educational, and emotional background of each member;
> - The defendant's relationship with and attitudes toward every member of the family;
> - Drug or alcohol use or abuse by himself and any or all members of the family;

*Id*. at 397.

C.    **The defense's case during the punishment phase**
1.    **The Defense's Case at Punishment**

The Defense's case at punishment was cursory and perfunctory.  It consisted of eight witnesses.  The defense's mitigating evidence at punishment merely touched upon Petitioner's childhood, including the ongoing abuse that he experienced and the poverty in which he lived.

The defense presented all witnesses to offer mitigating evidence, and few to offer evidence regarding Petitioner's future dangerousness. Priscilla Garcia (now Priscilla Zamora),

---

- Any mental health treatment of any member of the family, including the defendant;
- The cohesiveness of the family;
- The family's standard of living and living conditions;
- Any and all available school records;
- Any record of learning disabilities;
- Childhood and adult social relationships with members of the same and opposite sex;
- Any marriage, divorce, children, step-children, or surrogate family relationships, and their positive or negative influence upon the defendant;
- Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;
- Any and all traumatic experiences;
- Any and all especially proud moments;
- Membership in religious, social, educational, charitable organizations;
- The client's five best and worst memories.

Only after a lengthy and thorough interview with his client will defense counsel be in a position to decide which are the most promising mitigation areas to pursue. Because of finite resources and time, capital counsel's strategic and tactical decisions regarding the further investigation, development, and use of potential mitigating evidence should be given great deference. But deference is not due to counsel who fails to interview his client at sufficient length and depth to discover, as accurately as possible, the unvarnished truth about his client. … [C]apital counsel bears the responsibility for at least making every reasonable attempt to uncover possible mitigation facts from his client.

*Id*. at 400-01 (Cochran, J., concurring).

Petitioner's sister, very briefly testified about the sexual abuse that he experienced from his stepfather, who was also an avid drug user.  RR. Vol. 23: 4-12.  Although Ms. Garcia testified that she knew the "fondling" must have occurred more than once, she also stated that she had no way of gauging the frequency of the abuse.  RR. Vol. 23: 10.  Alexandra Garcia, Petitioner's younger sister, testified regarding Mr. Garcia's gang involvement, relationship with wife and children, drug use, job history, tattoos, friendships with the co-defendants, and experiences at Burnett-Bayland.  RR. Vol. 23: 12-37; 24: 87-95.  When asked regarding Johnny Sierra's, Mr. Garcia's stepfather's, method of "disciplining" Mr. Garcia, Ms. Garcia merely testified that he would spank Mr. Garcia with a belt, although she never personally witnessed it, and that he and Petitioner had once got into a physical altercation.  RR. Vol. 23: 24.  Heidy Ivette Garcia, Mr. Petitioner's wife, testified about the nature of their relationship, his job history, his loving relationship with his children, his friendships with the co-defendants, and the fact that they had not discussed the nature of his accusations.  RR. Vol. 23: 37-61.  Lynnie Ray Chatman, Petitioner's former cellmate, merely testified about Petitioner's lack of involvement in the Patrick Meece incident.  RR. Vol. 23: 65-93.  Adam Acosta, a deputy jailer at the Harris County Sheriff's Department, corroborated Mr. Chatman's previous testimony.  RR. Vol. 23: 94-104. Ana Solano, the victim's wife, testified about forgiving Petitioner's actions and her desire for the jurors to grant Petitioner a life, as opposed to a death, sentence.  RR. Vol. 23: 105-108.  Walter Quijano, the Defense's clinical psychologist, testified, in a somewhat abstract sense, regarding relevant dangerousness factors, safety measures and living conditions of TYC prisoners, and environmental factors that may affect a person's development.  RR. Vol. 23: 108 – 24: 78.  Mr. Quijano never actually examined Petitioner.  RR. Vol. 24: 75.

### 2. Trial counsel's deficient performance failed to uncover a wealth of mitigating evidence.



████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

**b.    Meaningful life history interviews**

Had trial counsel conducted a detailed, life history investigation of Petitioner's background and conducted meaningful and probing interviews of individuals familiar with Petitioner's background, counsel would have uncovered a wealth of mitigating information. Then, and only then, would trial counsel have been able to make an informed decision regarding

the extent to which the presentation of the gathered information should be limited.  Only then would trial counsel have also been able to make an informed decision about retaining a qualified PTSD expert.  Finally, and most importantly, only then would trial counsel have been able to make an informed decision about what kind of punishment phase case to present to the jury.

Family members and other individuals possessed material information about Petitioner's troubled childhood and its possible effects on his mental health.  When Petitioner was a young child, his stepfather, Johnny Sierra, beat him at least once or twice a day.  Exhibit F (Affidavit of Alexandra Garcia) at 2; Exhibit E (Affidavit of Becki Lyn Skidmore) at 3; Exhibit G (Declaration of Priscilla Zamora) at 2.  Mr. Sierra would yell at Petitioner for anything at all, and he would beat him whenever he felt that Petitioner had done something wrong, although Petitioner did not know any better.  *Id.*  Mr. Sierra physically beat Petitioner with anything he found around the house, including belt buckles and extension cords.  Exhibit F (Affidavit of Alexandra Garcia) at 2; Exhibit G (Declaration of Priscilla Zamora) at 2.  Some days, Petitioner "would get beaten all day long."  Exhibit F (Affidavit of Alexandra Garcia) at 2.  Mr. Sierra would also "throw uncooked rice and beans on the floor and make Juan kneel on them all day." *Id.*  On other occasions,

> If Juan forgot to feed the dog, Johnny would put Juan outside and not feed him. Johnny would not let Esther, [Mr. Garcia's] mother, give food to Juan either. Sometimes Juan would get so hungry that he would eat the dog food.

Exhibit E (Affidavit of Becki Lyn Skidmore) at 3.  Petitioner and his older sister, Priscilla Zamora were not able to play with their friends when they were young.  Exhibit G (Declaration of Priscilla Zamora) at 4.  They did not have any freedom, and the only time that they felt free was when Mr. Sierra was "gone or drunk." *Id.*

Mr. Sierra also beat Petitioner's mother, Esther, while Petitioner was forced to listen or

watch.  "Once, Juan was locked out of the house and he heard Johnny beating Esther.  When he got back in the house, Esther was bruised and bleeding on the ground.  Johnny had broken the broomstick and the mop handles by beating her."  Exhibit E (Affidavit of Becki Lyn Skidmore) at 5.  Esther Garcia was totally dependent on Mr. Sierra and catered to his every whim – even to the detriment of her children's welfare.  Alexandra Garcia asserts that "our mom, Esther, always put her husband Johnny before us kids."  Exhibit F (Affidavit of Alexandra Garcia) at 18.  Esther would give all of her money to Mr. Sierra if he demanded it, even if that meant the money earmarked for the children's shoes would be spent on Mr. Sierra's cigarettes and beer.  *Id.*  Esther "never wanted to see what Johnny was doing bad to us kids" and this is why she "always said that Johnny and Juan had a good relationship like father and son."  *Id.*

Both Petitioner and his sister Priscilla were sexually molested by Mr. Sierra.  Exhibit G (Declaration of Priscilla Zamora) at 3.  The children knew that Mr. Sierra would abuse them anytime that he was inebriated.  *Id.*  Mr. Sierra would "touch [Mr. Garcia] when he was asleep," and he would not allow Petitioner or Priscilla to go to bed "until he was ready to lay them down to bed."  *Id.*  As a result, Petitioner often had trouble sleeping.  *Id.*  Priscilla Zamora eventually reported this sexual abuse to CPS – when Mr. Sierra was taken away, Esther Garcia, their mother, got "really mad at her and told Priscilla that she was ruining her [Esther's] life."  Exhibit F (Affidavit of Alexandra Garcia) at 19.

Mr. Sierra also abused heroin in front of the children.  Exhibit E (Affidavit of Becki Lyn Skidmore) at 4.  The drug abuse became so ordinary and commonplace to the kids that they were effectively apathetic to it, claiming that Mr. Sierra was merely "sick and taking his medicine." *Id.*  Mr. Sierra went so far as to try to get Esther addicted to heroin – he would "hold Esther down and inject her with heroin until he got her addicted."  *Id.*

As a result of witnessing and experiencing such physical, sexual, mental and emotional abuse, Petitioner suffered from a variety of disturbances.   Petitioner's emotional coping mechanism was anger – several people noticed a severe change in Petitioner as a result of the abuse.   "He wasn't like this before my stepdad began abusing him.   The abuse made him that way."   Exhibit G (Declaration of Priscilla Zamora) at 7.   "Juan was very controlling and angry because of things that happened in his childhood.   He wouldn't talk about his childhood, but he cried a lot."   Exhibit H (Affidavit of Gloria Alejandro) at 3.   Petitioner's anger would be exacerbated by situations he could not understand.   For example, when he could not understand problems at school, he would become angry.   Exhibit D (Affidavit of Angela Costigan) at 5. Petitioner "bottled up inside" and became "protective of himself because of what was happening to him at home."   Exhibit F (Affidavit of Alexandra Garcia) at 7; Exhibit D (Affidavit of Angela Costigan) at 3.   Even in elementary school, Petitioner was a loner, because he "couldn't get past his fear of leaving himself vulnerable."   Exhibit D (Affidavit of Angela Costigan) at 3.   In fact, Petitioner was so emotionally insecure that

> [h]e couldn't see himself as part of something because he was afraid it would come back and slap him in the face . . . anything in Juan was so "neutralized" that he didn't feel or identify with anything or anyone.

Exhibit D (Affidavit of Angela Costigan) at 11.

Petitioner was perpetually vigilant and thus had trouble sleeping, even as a young child. He was always scared, and he would hear or see things that nobody else could hear or see. Exhibit G (Declaration of Priscilla Zamora) at 5; Exhibit F (Affidavit of Alexandra Garcia) at 8 ("He would see shadows and once saw a person come into his room when no one was there."). Petitioner only slept for about two to three hours at night, and he could only sleep when everyone else was home.   Exhibit F (Affidavit of Alexandra Garcia) at 9.   When he was finally able to

sleep, Petitioner had nightmares approximately three or more times a week, and would, when stressed, have them every night.   Exhibit D (Affidavit of Becki Lyn Skidmore) at 13. Petitioner's cousin, Patricia McBen, would frequently hear Petitioner screaming and crying throughout the night, and at times, she would "find him pacing the hallway at three or four in the morning" due to the nightmares." *Id.*

Petitioner's home life created an ongoing source of immense stress.   Exhibit D (Affidavit of Angela Costigan) at 9.  Even though he was often ridiculed and teased at school, he often talked about not wanting to go home because "[h]e knew he could do things at school and that he wasn't going to be brutalized for anything."  Exhibit D (Affidavit of Angela Costigan) at 9.   Petitioner ran away from home on several occasions because of his stepfather's abuse. Exhibit F (Affidavit of Alexandra Garcia) at 6.  Petitioner

> started running away when he was about eleven years old and would be [gone] for anywhere from three days up to a week.  He would run away when he was getting beaten a lot—for example, if he was constantly being beaten the entire day, he would just run away.

Exhibit F (Affidavit of Alexandra Garcia) at 6.

Petitioner could not envision a future for himself.  He was both "emotionally and mentally very destroyed," and felt hopeless about any sort of future existence, often stating that "there isn't anything for [him] to be."  Exhibit D (Affidavit of Angela Costigan) at 8, 15.  He was so involved in protecting himself, that a future just did not exist.  Exhibit D (Affidavit of Angela Costigan) at 15.   Petitioner attempted to commit suicide on at least three different occasions. Exhibit F (Affidavit of Alexandra Garcia) at 12; Exhibit H (Affidavit of Gloria Alejandro) at 4. When he was about seventeen years old, Petitioner first attempted to kill himself by submerging himself in the bathtub with a belt around his neck, and second by overdosing on some pills. Exhibit F (Affidavit of Alexandra Garcia) at 12.  Petitioner also "tried to hang himself on the tree

in [Ms. Alejandro's] backyard" when he was eighteen years old.  Exhibit H (Affidavit of Gloria Alejandro) at 4.  After this suicide attempt, Petitioner experienced breathing problems, much like anxiety attacks.  Exhibit H (Affidavit of Gloria Alejandro) at 5.

Counsel's failure to introduce such comprehensive mitigating evidence at Petitioner's penalty phase cannot be deemed strategic.  Had counsel obtained critical family interviews, they would have known that Petitioner's mental health symptoms warranted further investigation.  Only after completing this investigation would counsel then have been able to make an informed decision about retaining a PTSD expert to evaluate Petitioner.  Most importantly, counsel could have made an informed decision about what to present at the punishment phase of Petitioner's capital trial.

     **D.**     **Petitioner suffers from post-traumatic stress disorder.**

          1.  **DSM-IV definition of post-traumatic stress disorder:**

The Diagnostic and Statistic Manual of Mental Disorders, 4th Edition (hereinafter DSM-IV), defines post-traumatic stress disorder ("PTSD") with six criteria:

A. The person has been exposed to a traumatic event in which both of the following have been present:

> (1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others
> (2) the person's response involved intense fear, helplessness, or horror.

B. The traumatic event is persistently reexperienced in one (or more) of the following ways:

> (1) recurrent and intrusive distressing recollections of the event, including images, thoughts, or perceptions.
> (2) recurrent distressing dreams of the event.
> (3) acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience, illusions, hallucinations, and dissociative flashback episodes, including those that occur upon awakening or when intoxicated).

(4) intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event.

(5) physiological reactivity on exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event.

C. Persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness (not present before the trauma), as indicated by three (or more) of the following:

(1) efforts to avoid thoughts, feelings, or conversations associated with the trauma

(2) efforts to avoid activities, places, or people that arouse recollections of the trauma

(3) inability to recall an important aspect of the trauma

(4) markedly diminished interest or participation in significant activities

(5) feeling of detachment or estrangement from others

(6) restricted range of affect (e.g., unable to have loving feelings)

(7) sense of a foreshortened future (e.g., does not expect to have a career, marriage, children, or a normal life span)

D. Persistent symptoms of increased arousal (not present before the trauma), as indicated by two (or more) of the following:

(1) difficulty falling or staying asleep

(2) irritability or outbursts of anger

(3) difficulty concentrating

(4) hypervigilance

(5) exaggerated startle response

E. Duration of the disturbance (symptoms in Criteria B, C, and D) is more than one month.

F. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders DSM-IV-TR* 309.89 (4th ed. 2000).

2.     **Dr. Fred Sautter's expert report diagnosing Petitioner with PTSD and bipolar disorder with severe psychosis.**

Undersigned counsel requested the consultation of a psychologist, Frederic Sautter, to evaluate Petitioner's life history and possible PTSD claim.   Exhibit K (Forensic Trauma Assessment by Fred Sautter, Ph.D.).   Dr. Sautter's evaluation consisted of an unstructured

84

clinical interview and two exams:   the Structured Clinical Interview for Axis I DSM-IV
Disorders (SCID), and the Clinical Administered PTSD Scale (CAPS).

Dr. Sautter first explains Petitioner's tortured childhood, scarred by a stepfather who
regularly abused drugs and narcotics and engaged in criminal behavior; beat him with belts,
tools, extension cords, and fists; sexually abused him; mutilated animals in front of him; and
regularly beat his mother and sexually abused his sister.

By the age of ten, Petitioner began to respond to his feelings of intense emotional pain
and a strong desire to escape by becoming preoccupied with suicidal thoughts and by self-
mutilation.  "This began a lifelong pattern of suicidal behavior, self-mutilation, and dissociative
episodes in response to increases in emotional experience."  He began hearing voices telling him
that he was a bad person and that he should hurt himself, and Dr. Sautter notes that "these are the
types of hallucinations that may be experienced by a person who has been sexually abused, and
has become ashamed of his own experiences, feelings, and psychological problems."  Dr. Sautter
also explains that Petitioner's "internal response to his abuse accounts for his failure to
acknowledge many of his emotional problems to other people…."

> Self-mutilation does not occur in people without mental health problems.  Denial
> of problems often occurs in people that have been sexually abused: they feel
> ashamed of their problems because they associate these problems with their
> abuse.

Petitioner experienced episodes of anger that occur during dissociative episodes – these
episodes make him feel semiconscious and to be unaware of his surroundings.   These
dissociative episodes are usually preceded by PTSD reexperiencing symptoms, and he is
"flooded by memories of past abuse" which "trigger intensely painful emotional experiences that
he cannot control."  This pain is what causes him to lash out and cut himself, either because he is
distracting himself from the internal emotional pain, or because he dissociates (becomes

emotionally numb and detached) thereby becoming vulnerable to a loss of behavioral control. Importantly, Dr. Sautter reports that "these types of dissociation, emotional dysregulation, and self-mutilative behavior often occur in people with extensive histories of childhood sexual or physical abuse." During these dissociative episodes, "his risk for self-mutilation and suicide, and aggression against others, greatly increases."

Petitioner fulfills all the necessary criteria to be diagnosed with PTSD. Criterion A, "traumatic stressor" is fulfilled by his trauma-filled childhood, including: sexual abuse by his stepfather; regular physical beatings by his stepfather; witnessing his stepfather's sexual abuse of his older sister; witnessing his stepfather's violent physical abuse of his mother; watching animal torture and mutilation; and getting struck by a car. Criterion B, symptoms of re-experiencing the trauma, is met in the evidence that Petitioner has had intrusive distressing memories; nightmares of the trauma; flashbacks; and "both physical and psychological discomfort when confronted with reminders of the trauma." Criterion C, avoidance of stimuli that remind the individual of the trauma, is met with data both from the SCID and the CAPS, which show that Petitioner showed a number of avoidance and numbing symptoms, including avoidance of thoughts and feelings that remind him of the trauma; diminishment of pleasure; detachment from others; restricted range of affect; and a sense of a foreshortened future. His avoidance and numbing are severe, as he "showed all of the avoidance symptoms that are characteristics of PTSD." Finally, Criterion D, hyperarousal, is met with data from the SCID and the CAPS, which indicate the following hyperarousal symptoms: hyperstartle response; irritability; hypervigilance; and insomnia.

Dr. Sautter's findings indicate that because of Petitioner's exposure to a "high degree of psychological adversity as a child and adolescent," he is more vulnerable to mental disorders and

PTSD.  This psychological adversity may also have limited his "ability to report his problems to other people, cope with problems, and exercise good judgment under intellectually and emotionally challenging circumstances."   Based on the testing, records, affidavits, and client interview, Dr. Sautter diagnoses Petitioner as meeting the DSM-IV criteria for Bipolar Disorder with Severe Psychosis and with PTSD ("Extremely Severe Range" of PTSD severity).

Significantly, Dr. Sautter's findings indicate that when Petitioner committed this capital murder, "his PTSD symptoms probably fell within the severe range and influenced all aspects of his behavior" and that "his behavior may have been affected by psychotic symptoms, and an inability to regulate his emotions."

> It is virtually certain that [the PTSD] had a strong affect on his ability to make competent decisions regarding his behavior at the time of the homicide.  If Mr. Garcia experienced a threat to his psychological or physical well-being at the time of the homicide, it may be assumed that his PTSD symptoms would be stimulated, and that these trauma symptoms would stimulate emotions that he is usually unable to regulate or control.  The likelihood that his psychosis and paranoid thinking would affect his decision making would be very high.  Mr. Garcia could not be expected to show sound judgments or be able to control his behavior in a responsible manner under those circumstances.

It is clear that had defense counsel performed a meaningful investigation into Petitioner's childhood and background, his mental health symptoms would have become clear – even if records showed he was not reporting any mental health issues, the family interviews alone would have revealed a wealth of abuse and torture along with the effect these horrors had on Petitioner. Had defense counsel performed a meaningful investigation, this evidence would have been uncovered and an expert retained.  This expert's testimony could have presented a compelling case for mitigation, and would have resulted in a life sentence.

### 3. Defense's deficient performance failed to uncover mitigating evidence regarding PTSD.

Trial counsel's performance was deficient in that they failed to investigate, discover,

present, and explain mitigating evidence at the punishment phase of Petitioner's capital trial. Prior to the trial, counsel failed to conduct a detailed life-history investigation of Petitioner's background; failed to obtain a mental health expert to further examine Petitioner's apparent signs of mental illness, specifically PTSD; and failed to conduct meaningful interviews of Petitioner's family and other individuals who possessed critical information about his troubled childhood.

First and foremost, trial counsel did not retain a qualified a mental health, or more specifically, a PTSD expert to examine Petitioner for possible PTSD symptoms. A perfunctory investigation into Petitioner's background would have revealed the physical, mental and emotional abuse that Petitioner experienced as a child living with a violent stepfather, as well as the persistent effects of such abuse on Petitioner's behavior. *See* Exhibit F (Affidavit of Alexandra Garcia); Exhibit E (Affidavit of Becki Lyn Skidmore); Exhibit D (Affidavit of Angela Costigan); Exhibit H (Affidavit of Gloria Alejandro); and Exhibit G (Declaration of Priscilla Zamora). A mental health expert with access to such interviews could have determined whether Petitioner was afflicted with PTSD and if so, to what extent. Only with such professionally derived and detailed information could trial counsel determine that presentation of such facts was strategically undesirable.

Although prior to trial, counsel did hire Walter Quijano, a clinical psychologist in private practice with some emphasis on criminal justice work, Dr. Quijano never examined Petitioner in any respect. RR. 24: 75. In fact, Dr. Quijano merely testified, in a hypothetical sense, regarding relevant dangerousness factors, safety measures and living conditions of TYC prisoners, and environmental factors that may affect a person's development. RR. 23: 108 – 24: 78. Only with a detailed examination of Petitioner could defense counsel, through the testimony of Dr. Quijano, have adequately illustrated the realm of mitigating circumstances present in Petitioner's case.

Trial counsel did not attempt to present various witnesses or their detailed affidavits regarding Petitioner's childhood abuse and other pertinent mitigating circumstances surrounding his life.  Petitioner's special education teacher from elementary school stated that she was never contacted by Petitioner's attorneys prior to his trial.  *See* Exhibit D (Affidavit of Angela Costigan) at 16.  She additionally said that she would have been able to testify at Petitioner's trial had she been instructed to do so, and that she would have testified to what she stated in her affidavit.  *Id.*  Priscilla Zamora, Petitioner's older sister, states that Petitioner's attorneys did not talk to her before the trial and as a result, she felt unprepared and did not know what to expect from the trial.  *See* Exhibit G (Declaration of Priscilla Zamora) at 8.  She stated that the only reason that Petitioner's attorneys contacted her was merely to tell her that she would be called to testify at his trial, without any further explanation of what would actually occur during the trial.  *Id.*  Neither Ms. McBen nor Ms. Alejandro was called by defense counsel to testify at the punishment phase of Petitioner's trial, although both were aware of significant mitigating facts surrounding Petitioner's childhood.  *See* Exhibit E (Affidavit of Becki Lyn Skidmore); Exhibit H (Affidavit of Gloria Alejandro).

Trial counsel also failed to sufficiently present relevant mitigating evidence through the testimony of Alexandra Garcia, Petitioner's younger sister.  Ms. Garcia testified regarding Petitioner's gang involvement, schooling, relationship with wife and children, drug use, some job history, tattoos, and experiences at Burnett-Bayland. RR. 23: 12-37, 24: 87-95.  However, the only testimony evoked from Ms. Garcia by counsel regarding any abuse that Petitioner may have experienced as a child was that his stepfather typically disciplined him with a belt but that she never personally witnessed such abuse.  RR. 23: 24.  Alexandra Garcia possessed a much wider knowledge of Petitioner's physical abuse and consequent mental and emotional scarring that

counsel failed to bring out of her testimony during the punishment phase of Petitioner's trial. *See* Exhibit F (Affidavit of Alexandra Garcia).   In fact, Ms. Garcia stated that if Petitioner's counsel had inquired about Petitioner's abusive childhood, she would have told them what she knew regarding the abuse that Petitioner was forced to endure as a child.   *Id.*   However, Petitioner's counsel did not ask Ms. Garcia such questions until the trial itself.  *Id.*

Because trial counsel failed to conduct an adequate life-history investigation and failed to sufficiently prepare the testifying witnesses, the little relevant information they obtained at trial was a cursory examination of Petitioner's background.  At the penalty phase, counsel's narrow presentation of witnesses included eight relevant to mitigation, but only two that could testify regarding Petitioner's childhood.  Although the evidence at punishment demonstrated the state of Petitioner's life with his wife and children, his friendships with the co-defendants, and Petitioner's alleged involvement with Patrick Meece in jail, it only superficially suggested Petitioner's troubled relationship with his stepfather.  If counsel had presented such evidence in detail, it would have illustrated the vast and continual abuse that Petitioner experienced as a child, as well as the long-lasting effects that the abuse had on Petitioner.

Trial counsel unreasonably failed to investigate, discover, present, and explain mitigating evidence at the punishment phase of Petitioner's capital trial.  Trial counsel failed to conduct a detailed life-history investigation of Petitioner's background; failed to conduct meaningful interviews of Petitioner's family who possessed critical information about his troubled childhood; and failed to hire a PTSD expert to investigate and analyze Petitioner's exposure to PTSD.

4. **If evidence of Petitioner's PTSD had been presented during the punishment phase of Mr. Garcia's trial, there is a reasonable probability that the result of the proceeding would have been different.**

Because the punishment stage is directly related to the personal culpability of the defendant, the jury must be able to consider and give effect to mitigating evidence relevant to a defendant's character or record or circumstances of the offense. *Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989). In the case at bar, Defense failed to perform the work mandated by prevailing professional norms, as reflected in *Strickland v. Washington*, ABA Guidelines, and the State Bar of Texas Guidelines. Even though there were numerous indicators that Petitioner might suffer from PTSD, Defense ignored these indicators and failed to pursue a comprehensive mitigation investigation. Prior to trial, Defense failed to conduct a detailed investigation into Petitioner's personal and social history;  failed to conduct meaningful interviews of Petitioner's family and other individuals who possessed critical information regarding potential PTSD stressors; and failed to obtain a PTSD expert to further examine Petitioner's apparent symptoms of psychiatric disorder.

Texas law requires that all jurors unanimously agree to both of the punishment phase special issue questions in order to impose a sentence of death. Tex. Code Crim. Proc. Art. 37.071 sec. 2(d) (Vernon's 1984). If the jury fails to reach a unanimous decision, a life sentence is automatically imposed. *See id*. at sec. 2(d). Therefore, the proper prejudice analysis is whether one juror would have chosen to vote "no" to either punishment phase special issue had constitutional error not occurred. *See, e.g. Motley v. C*ollins, 18 F.3d 1223, 1227 & n.3 (5th Cir.), *cert. denied*, 513 U.S. 960 (1994) (citing *Landry v. Lynaugh*, 844 F.2d 1117, 1120 (5th Cir.), *cert. denied*, 488 U.S. 900 (1988)). The harm standard does not require a petitioner to demonstrate that the outcome of the sentencing phase of the trial would have been different in the absence of constitutional error; it requires only a showing that the error "undermined confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 693, 694–96 (1984) (rejecting

this formulation in favor of one that focuses on whether counsel's performance "undermined confidence" in verdict).

Petitioner's trial counsel failed to properly prepare and present a constitutionally effective punishment phase case.  Counsel failed to conduct a meaningful investigation that would have revealed a wealth of mitigating evidence.  Specifically, counsel failed to locate and present evidence concerning Petitioner's post-traumatic stress disorder that was mitigating in nature. Had counsel conducted a constitutionally adequate mitigation investigation and properly prepared for the punishment phase, Mr. Garcia would not have received a sentence of death. Indeed, one juror has declared that:

> The information in Alexandra Garcia's affidavit talking about the abusive family life might have impacted my decision on the death penalty.  Evidence of PTSD might have had a bearing on my decision for the death penalty.

Exhibit I (Declaration of Demetta Landry) at 5.  Another juror, JoAnn Taylor, recently reviewed the affidavits of Alexandra Garcia, Gloria Alejandro, Priscilla Zamora, and Angela Costigan – all of which contain significant evidence of Petitioner's abused and tortured childhood and PTSD symptoms about which these individuals would have testified at trial.  Exhibit L (Declaration of JoAnn Taylor) at 6.  Ms. Taylor states that had this mitigating testimony been presented at trial, "*I would have changed my vote from death to life*."  Exhibit L (Declaration of JoAnn Taylor) at 7.  It is clear that Petitioner was prejudiced by his trial counsel's failure to conduct a meaningful mitigation investigation – in fact, Petitioner would not have received a sentence of death had trial counsel presented this evidence to the jury.

Petitioner should be granted a new punishment phase trial in which jurors, after hearing a full presentation of all the mitigating and aggravating evidence, have a chance to formulate a

"'reasoned moral response to the defendant's background, character, and crime.'" *Penry,* 492

U.S. at 327 (quoting *California v. Brown,* 479 U.S. 538, 545 (O'Connor, J., concurring)

After claim development and a live evidentiary hearing, the writ must issue, mandating a

new punishment phase trial.

**VI.    Mr. Garcia was deprived of the right to effective assistance of counsel by his appellate counsel's failure to present strong mitigating evidence of Mr. Garcia's post-traumatic stress disorder, in violation of the Sixth and Fourteenth Amendments.**

Every criminal defendant has a right to effective assistance of counsel on his first direct

appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466

U.S. 668 (1984).   Counsel's role on direct appeal is "that of an expert professional whose

assistance is necessary in a legal system governed by complex rules and procedures for the

defendant to obtain a decision at all—much less a favorable decision—on the merits of the case."

*Evitts*, 469 U.S. at 394.  Thus, appellate counsel must make "a conscientious examination" of the

record to identify *all* of the potential issues for an appeal, thoroughly research every colorable

claim, and make a reasonable professional judgment about which points to raise.   *Anders v.*

*California*, 386 U.S. 738, 744 (1967).  To do so, appellate counsel "must have a firm command

of the facts of the case as well as governing law before [they] can render reasonably effective

assistance of counsel."

Direct appeal counsel's performance was unreasonable under the prevailing professional

norms and there is a reasonable probability that, but for appellate counsels' errors, Mr. Garcia's

conviction or death sentence would have been reversed on direct appeal.   *See Duhamel v.*

*Collins*, 955 F.2d 962, 966 (5th Cir. 1993); *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir.

1991).  The two-pronged *Strickland* standard of deficient performance and prejudice governing

claims of ineffectiveness of trial counsel likewise applies to the ineffectiveness of direct appeal

counsel. *Evitts*, 469 U.S. at 387.  Appellate counsel's inexcusable failure to raise a point of error that had a reasonable probability of success would be sufficient to make the showing of deficient performance. *Duhamel*, 955 F.2d at 966–67.

Direct appeal counsel in Mr. Garcia's case failed to present the potentially meritorious claim that Mr. Garcia suffered from post-traumatic stress disorder, which would have been a strong mitigating factor if presented to the jury at trial.  Because there is a reasonable probability that Mr. Garcia would have prevailed on these claims had they been timely presented to the Texas Court of Criminal Appeals in his direct appeal brief, Mr. Garcia is entitled to a new direct appeal process.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Garcia prays that this Court:

1. Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2. Grant him further discovery and an evidentiary hearing at which he may present evidence in support of these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing;

3. Direct that under Habeas Corpus Rule 7 the record in this case be expanded to include the "additional materials relevant to the determination of the merits of the petition" which are found in the volume of exhibits filed with this Petition.

4. Grant such other relief as law and justice require.

Respectfully submitted,

/s/ David R. Dow

_____
David R. Dow
Texas Bar No. 06064900
Frances Bourliot
Texas Bar No. 24062419
Texas Defender Service
1927 Blodgett Street
Houston, Texas 77004
Tel:  (713) 222-7788
Fax: (713) 222-0260

*Counsel for Juan Martin Garcia, Petitioner-Appellant*

95

**VERIFICATION**

State of Texas          )
County of Harris        )

     I, David R. Dow, attorney for Petitioner in the above-entitled action, being duly sworn, state that to the best of my knowledge and belief, the facts sets for in this Petition are true and correct.


                                   /s/ David R. Dow
                                   _____

                                   David R. Dow

**CERTIFICATE OF SERVICE**

On Monday, March 1, 2010, I electronically filed the forgoing pleading with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the court.  A "Notice of Electronic Filing" was sent to Ms. Georgette Oden, attorney of record for Respondent Thaler, at her email address:  georgette.oden@oag.state.tx.us.

/s/ David R. Dow

_____

David R. Dow